## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL INSTITUTE FOR FAMILY AND LIFE ADVOCATES, GIANNA'S HOUSE, INC., and CHOOSE LIFE OF JAMESTOWN, INC. d/b/a OPTIONS CARE CENTER, | |
| *Plaintiffs*, | JURY DEMANDED |
| v. | Case No.: _____ |
| LETITIA JAMES, in her official capacity as Attorney General of the State of New York, | |
| *Defendant*. | |

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Plaintiffs, National Institute for Family and Life Advocates ("NIFLA"), on behalf of itself and its members, Gianna's House, Inc. ("Gianna's House"), and Choose Life of Jamestown, Inc. d/b/a Options Care Center ("Options Care Center") (together, "Plaintiffs"), by and through the undersigned counsel, hereby file this Verified Complaint for Declaratory Judgment and Injunctive Relief against Defendant, New York Attorney General Letitia James, to redress violations of the United States Constitution, respectfully showing the Court as follows:

### INTRODUCTION

1.      Seventeen months ago, Maranda welcomed her daughter into this world. Today, Myli'anna is a precocious toddler, but she wouldn't be alive if not for information published by abortionpillreversal.com and a New York pro-life pregnancy center about the possibility of using progesterone treatment, sometimes

1

referred to as "Abortion Pill Reversal" or "APR,"[1] to continue her pregnancy. Facing an unexpected pregnancy, not thinking she was ready to be a mom, and with the baby's father not wanting her child, Maranda took mifepristone—a drug that blocks naturally occurring progesterone and normally leads to the death of the unborn child.

2.      But Maranda quickly began to question if she had made the right decision. Soon, she regretted it deeply and frantically sought information about whether she could save her baby.

3.      Thankfully, Maranda was able to find information on Syracuse-based New Hope Family Services' website about a method of using FDA-approved progesterone supplements, which physicians may lawfully prescribe under New York law, in an effort to save a developing child by counteracting the hormone-blocking effects of mifepristone.

4.      New Hope referred Maranda to an onsite medical professional who treated her—for free—with supplemental progesterone.

5.      It saved her unborn child's life; Myli'anna was born healthy about seven months later.

6.      But if Defendant, the Attorney General of New York, had her way, Myli'anna may not be alive today.

7.      That's because Maranda would likely never have heard about the possibility that her baby could survive after taking the first abortion drug, or that progesterone treatment might increase her likelihood of survival.

8.      Maranda states: "[i]f it wasn't for the information about Abortion Pill Reversal online, I would have completed the abortion and Myli'anna would not be

---

[1] Kim Hayes, *"Really thankful" – New York center welcomes latest abortion pill reversal save*, PREGNANCY HELP NEWS (May 2, 2023), https://perma.cc/B7DR-W5ZK.

alive today." The Attorney General is working to stop pro-life pregnancy centers like New Hope from providing truthful information about using progesterone treatment for APR.

9.      The Attorney General is invoking the State's power to regulate business fraud to stop nonprofit pregnancy centers and a network of affiliated centers from providing the information that saved Myli'anna's life. She recently sued the center—and ten other similarly situated centers—that helped Maranda save her baby. None of those centers are plaintiffs here.

10.     The Attorney General alleges that New Hope and the other pro-life pregnancy centers are spreading "false and misleading" information about progesterone treatment. She seeks an injunction and other penalties to censor their attempts to provide this information.

11.     Plaintiffs wish to truthfully inform women who have taken the first abortion drug that it may be possible to counteract its lethal effects if they change their mind and seek treatment within the first few days after taking the first drug.

12.     They wish to say the same (and similar) things that New Hope did about progesterone treatment, but if they do, the Attorney General's actions threaten them with "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other" ruinous relief she can obtain from the Supreme Court of the State of New York. Letter from State of New York Office of the Attorney General to Heartbeat International (Apr. 22, 2024), Ex. A.

13.     The information plaintiffs wish to provide women is supported by multiple studies.

14.     Having cited some of these studies in her lawsuit against other pro-life pregnancy centers in state court, the Attorney General knows full well that the contested statements about progesterone treatment are supported by research but

has targeted centers that tell women about this option because of the centers' pro-life viewpoint and the content of their speech.

15.     Despite saying that she supports women's choice, the Attorney General seeks to deprive women who change their mind and want to continue their pregnancies, or who are coerced or tricked into a chemical abortion, of truthful information about progesterone treatment, a safe option that has been used by obstetrician-gynecologists to help maintain pregnancies for decades.

16.     The Constitution secures Plaintiffs' right to speak to interested women about lawful medical treatments provided by licensed physicians.

17.     This action seeks to enjoin the Attorney General from targeting, chilling, and punishing Plaintiffs' speech about progesterone treatment, and to declare that her actions violate Plaintiffs' First and Fourteenth Amendment rights to speak freely, to practice their religion, and to due process under the law.

## JURISDICTION AND VENUE

18.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

19.     The court has subject matter jurisdiction over the Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343.

20.     This court can issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendant resides in the state of New York and a substantial part of the events or omissions giving rise to the claim occurred in the Western District of New York.

## THE PARTIES

### *National Institute of Family and Life Advocates and Its Members*

22.   NIFLA is a 501(c)(3) nonprofit, faith-based organization incorporated under the laws of Virginia and with a principal place of business in Fredericksburg, Virginia.

23.   NIFLA is a Christian, non-denominational ministry.

24.   NIFLA is a membership organization with member pregnancy centers located across the nation, including 51 centers in New York.

25.   One of NIFLA's New York members is Plaintiff Gianna's House.

26.   Another one of NIFLA's New York members is Plaintiff Options Care Center.

27.   NIFLA's mission is to empower women and men facing unplanned pregnancies to choose life and to protect life-affirming pregnancy centers by equipping them with legal resources, counsel, education, training, and support, and by representing their interests in litigation when necessary to preserve their constitutional rights. It aims to develop a network of life-affirming ministries in every community across the nation.

28.   NIFLA also routinely speaks about APR, advising its members and women about the progesterone treatment option.

29.   NIFLA's own speech is chilled and altered and its mission is impaired by the Attorney General's censorship campaign against APR content.

30.   NIFLA's members do not provide or refer for abortions or emergency contraception.

31.   NIFLA and its members affirm that God is sovereign over all life, and that he calls and commands them to make special efforts to protect the unborn.

32.    To that end, NIFLA's New York members offer free services, such as pregnancy tests, counseling, information concerning pregnancy options, and material support to new mothers and fathers.

33.    Many of NIFLA's New York members also refer for on-site medical services, such as ultrasounds, under the direction of an affiliated licensed physician or medical professional.

34.    NIFLA's New York Members do not perform progesterone treatment; they refer clients interested in this service to physicians who prescribe it.

35.    All referrals for progesterone treatment by NIFLA's New York members are offered free of charge. Neither NIFLA nor its members receive any renumeration for these referrals.

36.    The women referred by NIFLA and its members to partnering physicians for progesterone treatment do not pay for the progesterone treatment.

37.    NIFLA's New York members advertise their services and any referral services on their websites and through print handouts and brochures, newspaper or magazine ads, television commercials, social media, and other online ads.

38.    Some of NIFLA's New York members make, have made, or would like to make statements about progesterone treatment that the Attorney General alleges violate New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349 and 350 ("the Business Fraud Statutes").

39.    New York NIFLA members' speech, including that of Gianna's House and Options Care Center, is chilled because of the Attorney General's censorship campaign against pro-life pregnancy centers.

40.    These New York members have standing to sue in their own right.

41.    NIFLA also asserts associational standing on behalf of its New York members, whose ability to advertise and provide services, counseling, and information about progesterone treatment are impeded by the Attorney General's

application of New York law and her censorship campaign against pro-life pregnancy centers. *See New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988).

42.     The interests that NIFLA seeks to protect are germane to NIFLA's purpose as a membership association, including supporting pro-life pregnancy center members, enabling them to carry out their missions consistent with their pro-life and religious viewpoints, protecting members' legal interests, and empowering women and men facing unplanned pregnancies to choose life for their unborn children.

43.     NIFLA also sues on its own behalf.

44.     NIFLA asserts organizational standing on behalf of itself because the Attorney General's challenged actions harm NIFLA's efforts to achieve its mission and force NIFLA to divert its resources away from achieving that mission.

### *Gianna's House*

45.     Gianna's House, Inc. is a 501(c)(3) nonprofit, faith-based organization incorporated under the laws of New York and with a principal place of business in Brewster, New York.

46.     Gianna's House is a NIFLA member.

47.     Gianna's House is a Catholic ministry that seeks to empower women experiencing unexpected pregnancies, as well as the fathers of those babies, to break down obstacles and choose life for their children.

48.     Gianna's House offers a variety of free services, including self-administered pregnancy tests, options counseling, peer counselors and individual mentors, motherhood and fatherhood groups and educational classes, material aid, post-abortion support, and referrals for related services.

49.     Gianna's House was incorporated in 2022 and operates out of one location in Brewster, New York.

50.     Gianna's House provides all of its services entirely free of charge.

51.     Gianna's House has been preparing to offer medical services by referral to affiliated, on-site medical professionals.

52.     Gianna's House has partnered with one physician and two nurses to soon refer for on-site, limited diagnostic ultrasounds to confirm pregnancy and gestational age and potentially to administer progesterone treatment.

53.     These affiliated physicians and nurses have been undergoing extensive ultrasonographic training and expect to be prepared to offer on-site ultrasound services to confirm pregnancy by year-end.

54.     All of Gianna's House's employees, board members, and key volunteers must be practicing Christians and must adhere to its statement of faith.

55.     Gianna's House believes and affirms that God gives every human life dignity from the moment of conception. Accordingly, the center believes that if it has an opportunity to help a mother who wishes to save her child after taking mifepristone, it is compelled to do that if there is a chance of saving the child. This religious belief also compels the center's statements regarding progesterone treatment.

56.     In the past, Gianna's House has made various statements about progesterone treatment on its websites and in its newsletter, some of which were identical or nearly identical to, and others of which were substantially similar to, the statements made by the faith-based, pro-life pregnancy centers that have been sued by the Attorney General.

57.     To be true to its beliefs, teaching, mission, and values, Gianna's House abides by its Catholic beliefs in how it operates and what and how it communicates to its clients, partners, and the public.

### Options Care Center

58.     Options Care Center is a 501(c)(3) nonprofit, faith-based organization incorporated under the laws of New York and with a principal place of business in Jamestown, New York.

59.     Options Care Center is a NIFLA member.

60.     Options Care Center has served women and men in its community since 1985 by equipping them with knowledge to make educated and life-affirming choices regarding sexual health and pregnancy. And since 1986, Options Care Center has supported pregnant women and their families throughout pregnancy and beyond.

61.     Options Care Center operates one facility in Jamestown, New York.

62.     Options Care Center does not charge for its services.

63.     To fulfill its mission, Options Care Center offers self-administered pregnancy tests; parenting education and healthy relationship classes; compassionate post-abortion care and support; and information regarding parenting, adoption, and abortion to women facing unplanned pregnancies.

64.     Options Care Center is an affiliate and distribution center for Every Bottom Covered, a nonprofit organization in Buffalo, New York, that provides low-income families with supplemental diapers and wipes.

65.     Options Care Center partners with volunteer medical professionals to refer for no-cost, on-site services such as ultrasounds, limited sexually transmitted infection testing and treatment, and progesterone treatment. All ultrasounds are performed by a registered diagnostic medical sonographer or nurse sonographer, and all sonograms are read by an obstetrician-gynecologist who oversees the partnering medical staff, all of whom are volunteers.

66.     Clients consistently express gratitude and satisfaction with Options Care Center's services in exit surveys and Google Business reviews.

9

67.     Options Care Center does not perform or refer for abortions, and the center clearly states so on each page of its websites, intake documents, and conversations with new and potential clients.

68.     Options Care Center is a faith-based organization; everyone from its board to volunteers are required to be Christian believers and adhere to its statement of faith.

69.     The center abides by its Christian beliefs in how it operates, including what it teaches and how it treats others.

70.     Central to its beliefs is that life begins at conception and that God created every child in his mother's womb. Options Care Center further believes that its expression of love and service to God requires that it work to protect and honor life at all stages of development. These beliefs also compel the center's statements about and actions regarding progesterone treatment.

71.     Prior to the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, Options Care Center made various statements about progesterone treatment on its websites, its newsletter, and its print materials, some of which were identical or nearly identical to, and others of which were substantially similar to, the statements made by the faith-based, pro-life pregnancy centers that have been sued by the Attorney General.

### Attorney General Letitia James

72.     Defendant Letitia James is sued in her official capacity as the attorney general of New York for violating the federal constitution.

73.     The Attorney General is the chief legal officer of the State of New York.

74.     She has the authority to bring enforcement actions for violations of the Business Fraud Statutes and has used this authority to bring an enforcement action against parties similarly situated to Plaintiffs to enjoin and penalize the expression

of content about progesterone treatment that Plaintiffs have published in the past and wish to publish in the future.

## FACTUAL BACKGROUND

### I.    Pro-Life Pregnancy Centers

75.    Thousands of pro-life pregnancy centers across the country, including NIFLA members, provide free services, resources, information, adoption referrals, counseling, and material support to women and families experiencing unexpected pregnancies.

76.    Many of these pro-life pregnancy centers also provide or refer for medical services under the supervision of licensed medical directors or through affiliated on-site medical professionals, such as ultrasounds, STI testing and treatment, and progesterone treatment.

77.    Often pro-life pregnancy centers provide training and support for fathers so that mothers will be supported by their partners and children by both parents.

78.    In 2022 alone, pro-life pregnancy centers provided services valued at over $358 million. This includes over 500,000 free ultrasounds, 200,000 STI tests, 3.5 million packs of diapers, 43,000 car seats, and more.[2]

79.    Pro-life pregnancy centers are almost uniformly faith-based, Christian organizations.

80.    Unlike abortion clinics, which have a financial interest in performing as many abortions as possible, most pro-life pregnancy centers—including Plaintiffs—charge nothing for their services, meaning that they do not financially benefit from any choice a woman makes.

---

[2] *Pregnancy Centers Offer Hope for a New Generation*, CHARLOTTE LOZIER INSTI-TUTE, (2022), https://perma.cc/WJJ2-45K3.

81.     The reproductive health journal *Contraception* published a study showing that pro-life pregnancy centers offer more efficient help at a lower cost than abortion facilities, have shorter wait times, and are more available for same-day care. Abortion facilities almost always require clients to pay for pregnancy tests and ultrasounds, while pro-life pregnancy centers almost always offer these services for free.[3]

## II.     The Use of Supplemental Progesterone for Abortion Pill Reversal

82.     The use of supplemental progesterone for abortion pill reversal is backed by scientific research.

### *Use of Progesterone in Pregnancy*

83.     Progesterone is a naturally occurring hormone that plays an essential role in regulating female reproductive function in the uterus, ovaries, mammary glands, and brain. It is critical to achieve and maintain a healthy pregnancy.[4]

84.     During the first ten weeks of pregnancy, progesterone is naturally secreted by the corpus luteum while the placenta develops. It is thereafter secreted by the placenta.[5]

85.     Progesterone prepares the uterine lining (endometrium) to accept implantation of the embryo and stimulates the tissue glands to secrete nutrients for the embryo.[6]

---

[3] Kavita Vinekar et al., *Early pregnancy confirmation availability at crisis pregnancy centers and abortion facilities in the United States*, 117 CONTRACEPTION 30, (Sep. 6, 2022). A true and accurate copy is attached as Ex. B.

[4] *See generally* Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 INT'L J. MOLECULAR SCIS. 14, July 2022. A true and accurate copy is attached as Ex. C.

[5] Jessie K. Cable, *Physiology, Progesterone*, STATPEARLS PUBLISHING (Michael H. Grider ed., 2022). A true and accurate copy is attached as Ex. D.

[6] *See* Arri Coomarasamy et al., *PROMISE: first-trimester progesterone therapy in women with a history of unexplained recurrent miscarriages – a randomised, double-*

86.     Later in pregnancy, progesterone relaxes the smooth muscle cells, helping to suppress uterine contractions until delivery.[7]

87.     Progesterone has been used to support female fertility in a variety of ways for more than 50 years.[8]

88.     Progesterone is commonly prescribed by obstetricians and gynecologists to support patients with a history of recurrent miscarriages, prevent preterm birth, support endometrial function during in vitro fertilization, treat absent menstrual periods (secondary amenorrhea), treat excessive blood loss during menstruation, treat premenstrual syndrome, and prevent irregular thickening of the endometrium during menopause.[9]

89.     The U.S. Food and Drug Administration (FDA) approved progesterone in 1998 to treat irregular thickening of the endometrium (endometrial hyperplasia) in post-menopausal women.[10]

90.     Progesterone is classified as a Category B drug for pregnant women—the same category as Tylenol, the most commonly used pain reliever during

---

blind, placebo-controlled, international multicentre trial and economic evaluation, 20 HEALTH TECH. ASSESSMENT 41, May 2016, at 1. A true and accurate copy is attached as Ex. E.

[7] See N.E. Simmons et al., The long-term effect of prenatal progesterone treatment on child development, behaviour and health: a systematic review, 128 BRIT. J. OF OBSTETRICS & GYNAECOLOGY 964, Nov. 2020. A true and accurate copy is attached as Ex. F.

[8] See Gian Carlo Di Renzo et al., Progesterone: History, facts, and artifacts, 69 BEST PRACTICE & RSCH. CLINICAL OBSTETRICS & GYNAECOLOGY 2, 9 (2020). A true and accurate copy is attached as Ex. G.

[9] See Kolotorova et al., supra note 4.

[10] Letter from Lisa Rarick M.D., Food and Drug Admin. to Joseph Lamendola, Ph.D., Schering Corp. (Dec. 16, 1998), https://perma.cc/M7T7-VSDL.

pregnancy.[11] Category B drugs for pregnant women have been shown to pose no risk in animal studies, including no demonstrated risk to the fetus.[12]

91.    Healthcare professionals may lawfully prescribe or use a prescription drug consistently with the FDA-approved label, i.e., "on-label use," or for uses not prescribed, recommended, or suggested by the FDA-approved label, i.e., "off-label uses."

92.    Off-label use of prescription drugs is a widespread and accepted practice in health care.[13]

93.    The FDA has long authorized healthcare professionals to prescribe FDA-approved drugs off-label, stating that "[o]nce a [drug] product has been approved for marketing, a physician may prescribe it for uses or in treatment regimens of patient populations that are not included in approved labeling."[14]

---

[11] Prometrium Label, at 19, U.S. FOOD AND DRUG ADMINISTRATION, https://perma.cc/CR46-2FTS; *Prometrium Prescribing Information*, DRUGS.COM, https://perma.cc/RDN3-WNQ8; *see also* EMILY OSTER, EXPECTING BETTER, 169 (2016).

[12] Jessica C. Leek & Hasan Arif, *Pregnancy Medications*, STATPEARLS PUBLISHING (Jul. 24, 2023), https://perma.cc/KL52-74KM.

[13] *See, e.g.*, Agata Bodie, CONG. RSCH. SERV., R45792, *Off-Label Use of Prescription Drugs* 10 (Feb. 23, 2021), (estimating that off-label prescriptions make up as much as 38% of doctor-office prescriptions in the United States (collecting sources)). A true and accurate copy is attached as Ex. H. *See also, e.g., Washington Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("[I]t is undisputed that the prescription of drugs for unapproved uses is commonplace in modern medical practice and ubiquitous in certain specialties.").

[14] Citizen Petition Regarding the Food and Drug Administration's Policy on Promotion of Unapproved Uses of Approved Drugs and Devices; Request for Comments, 59 Fed. Reg. 59820-01, 59821 (Nov. 18, 1994) (quoting 12 FDA Drug Bulletin 1, Apr. 1982, at 5, https://perma.cc/A5UJ-C5YL; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (explaining that "'off-label' usage … is an accepted and necessary corollary of the FDA's mission to regulate … without directly interfering with the practice of medicine").

94.     Excepting treatment for endometrial hyperplasia and secondary amenorrhea, all uses of supplemental progesterone are considered "off-label uses."

95.     Obstetricians frequently prescribe drugs for off-label uses during pregnancy.

96.     In November 2021, the United Kingdom's National Institute of Health and Care Excellence (NICE) published new guidelines, based on a review of recent studies—including the Progesterone in Spontaneous Miscarriage (PRISM) study—recommending progesterone treatment for women with early pregnancy bleeding and at least one previous miscarriage.[15]

97.     The NICE committee specifically noted that "there was no evidence of harms for women or babies" from progesterone treatment, including "no increase in risk of stillbirth, ectopic pregnancy, congenital abnormalities or adverse drug reactions."[16]

98.     The PRISM study followed over 4,000 women at 48 hospitals in the United Kingdom and found a 3% greater live birth rate among the women who received progesterone treatment. The study found a 15% greater live birth rate among women with early pregnancy bleeding and three or more prior miscarriages. It also found no increased risk of birth defects.[17]

---

[15] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE) (updated Nov. 24, 2021), (Guideline NG126, Recommendation 1.5.2). A true and accurate copy is attached as Ex. I.

[16] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE), 16 (Nov. 2021), (Guideline NG126 Update). A true and accurate copy is attached as Ex. J.

[17] Arri Coomarasamy et al., *A Randomized Trial of Progesterone in Women with Bleeding in Early Pregnancy*, 380 NEW ENG. J. MED. 1815 (2019). A true and accurate copy is attached as Ex. K.

99.     Another recent study, known as the Progesterone in Recurrent Miscarriages (PROMISE) study, evaluated more than 800 women with unexplained recurrent miscarriages in 45 hospitals in the United Kingdom and the Netherlands.

100.     Although progesterone treatment under those circumstances did not produce a "significant difference" in the rate of live births, there was also no increased risk of birth defects.[18]

### Chemical Abortion

101.     Chemical abortion, also known as "medication abortion," refers to the use of prescribed drugs to terminate pregnancy.

102.     The current abortion drug regimen consists of two drugs: mifepristone (originally marketed as "RU-486" and now as "Mifeprex") and misoprostol.

103.     The FDA approved the two-drug regimen in 2000. Under the approved protocol, a woman takes mifepristone orally, followed up to 48 hours later by misoprostol.[19]

104.     Mifepristone is a synthetic steroid developed in the 1980s and is a progesterone receptor antagonist, meaning that it binds to and blocks the same intracellular receptors as progesterone.[20]

105.     As the FDA explains, "[m]ifepristone is a drug that blocks a hormone called progesterone that is needed for a pregnancy to continue."[21]

---

[18] Coomarasamy et al., supra note 6.

[19] *Summary Review for Regulatory Action*, U.S. FOOD AND DRUG ADMINISTRATION (Mar. 29, 2016), https://perma.cc/F468-UFEJ.

[20] *See generally* Springer US, *The Antiprogestin Steroid RU 486 and Human Fertility Control* (Etienne-Emile Baulieu & Sheldon J. Segal eds., 1985). A true and accurate excerpt is attached as Ex. L.

[21] *Questions and Answers on Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation*, U.S. FOOD AND DRUG ADMINISTRATION, https://perma.cc/5XDY-Q4T3.

106.    By blocking the progesterone receptors, mifepristone causes the uterine lining to deteriorate, blocking oxygen and nutrition to the developing embryo or fetus and eventually resulting in detachment of the embryo or fetus. It also softens the cervix and renders the uterus vulnerable to contractions.[22]

107.    Misoprostol induces uterine contractions to expel the embryo or fetus and gestational sac.

108.    Since approving mifepristone, the FDA has considered it a high-risk drug that can cause many serious adverse events even when used in accordance with the approved label.

109.    This is why mifepristone is "only available through a restricted program called the MIFEPREX REMS Program."[23]

110.    A REMS, or "Risk Evaluation and Mitigation Strategy," is a drug safety program required for certain medications with serious safety concerns.[24]

111.    The FDA imposes a REMS when it determines that additional safeguards are necessary so that the benefits of the drug outweigh its risks.

112.    The FDA's current label for mifepristone contains a black box warning that the drug can cause "[s]erious and sometimes fatal infections or bleeding."[25]

113.    It also directs women to emergency rooms if one of many adverse complications arise.[26]

---

[22] Mary L. Davenport et al., *Embryo Survival After Mifepristone: A Systematic Review of the Literature*, 32 ISSUES L. & MED. 1 (2017). A true and accurate copy is attached as Ex. M.

[23] *Highlights of Prescribing Information, MIFEPREX (mifepristone) tablets, for oral use*, U.S. FOOD AND DRUG ADMINISTRATION (Mar. 2016), https://perma.cc/4895-X457.

[24] *Risk Evaluation and Mitigation Strategies*, U.S. FOOD AND DRUG ADMINISTRATION (May 16, 2023), https://bit.ly/4aF77VU.

[25] *See supra* note 23 (FDA Mifeprex Label).

[26] *Id.*

114.    The FDA's mifepristone label cites two studies in which, respectively, 2.9% and 4.6% of participating women ended up in an emergency room after using the drug.[27]

115.    The FDA's mifepristone label also acknowledges that the drug fails over 7% of the time at 10 weeks' gestation.[28]

116.    The FDA also warns that "[a]bout 2 to 7 out of 100 women taking [mifepristone] will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding."[29]

117.    The pro-abortion Guttmacher Institute reports that over 640,000 chemical abortions occurred in the United States in 2023.[30]

118.    Applying the FDA's 2.9–4.6% emergency room data to the Guttmacher Institute's figures means that mifepristone causes tens of thousands of women to seek emergency medical treatment each year.

**The Safety and Efficacy of Progesterone Treatment**

119.    Some women experience regret after taking mifepristone but before taking misoprostol.

120.    Some women have also taken mifepristone under duress or by trick or force.[31]

---

[27] *Id.*

[28] *Id.*

[29] *Medication Guide, Mifeprex (mifepristone) tablets, for oral use*, U.S. FOOD AND DRUG ADMINISTRATION (Mar. 2016), https://perma.cc/NLV6-JB49.

[30] News Release, *Medication Abortions Accounted for 63% of All US Abortions in 2023, an Increase from 53% in 2020*, GUTTMACHER INSTITUTE (Mar. 19, 2024), https://perma.cc/D2EP-CPTH.

[31] *See, e.g.,* Lauren Aratani, *Texas man faces charges for allegedly slipping abortion drug in wife's drink*, THE GUARDIAN (Nov. 14, 2022), https://perma.cc/8NJD-3SSF; *Civil servant guilty of spiking drink with abortion drug*, BBC NEWS (May 3, 2022), https://perma.cc/U43C-C2VU; Andy Wells, *NHS nurse struck off for supplying*

121.   If a woman has taken mifepristone but has not yet taken misoprostol and decides she would like to continue her pregnancy, she may request supplemental progesterone to try to counter the effects of mifepristone. This progesterone treatment is commonly called "Abortion Pill Reversal," or APR.

122.   The basic biochemical premise of progesterone treatment is that the function of a receptor antagonist (*i.e.*, mifepristone) can be inhibited by increasing the concentration of the receptor agonist (*i.e.*, progesterone).[32] This process is supported by a biochemical principle called "reversible competitive inhibition."

123.   Progesterone therapy therefore involves supplementing the pregnant mother's natural progesterone to curb and outlast the effects of the mifepristone.

124.   Like most other uses of supplemental progesterone, progesterone treatment for APR is an off-label use.

125.   The scientific literature demonstrates the ability of progesterone to counteract mifepristone by reversible competitive inhibition.

---

*abortion pills to man who 'force-fed' them to pregnant partner*, YAHOO!NEWS (Sept. 23, 2021), https://perma.cc/G88T-AXHX; Kevin Murphy, *Abortion-drug dealer pleads guilty, linked to Grand Rapids man accused of poisoning pregnant woman's drink*, WISCONSIN RAPIDS TRIBUNE (Mar. 5, 2020), https://perma.cc/4JSV-AJ64; Kristine Phillips, *A doctor laced his ex-girlfriend's tea with abortion pills and got three years in prison*, THE WASHINGTON POST (May 19, 2018), https://perma.cc/W7QM-Q9VZ; Loulla-Mae Eleftheriou-Smith, *Man forced ex-girlfriend to miscarry after secretly feeding her abortion pills in a smoothie*, INDEPENDENT (Mar. 13, 2015), https://perma.cc/KJF4-E9VX; Lateef Mungin, *Man pleads guilty to tricking pregnant girlfriend into taking abortion pill*, CNN (Sept. 10, 2013), https://perma.cc/RT4R-6LLL.

[32] *See generally* Barbara J. Pleuvry, *Receptors, agonists and antagonists*, 5 ANAESTHESIA & INTENSIVE CARE MEDICINE 10 (2004). A true and accurate copy is attached as Ex. N.

126.   In 1989, researchers investigated "the role of progesterone in the maintenance of pregnancy" using groups of pregnant rats.[33]

127.   Rats are used in biomedical research due to their anatomical, physiological, and genetic similarity to humans.

128.   After four days, only a third of the rats who received mifepristone remained pregnant, but all of the rats who were given progesterone in addition to mifepristone remained pregnant.

129.   In 2018, Dr. George Delgado published an observational case series that followed 754 pregnant women who had taken mifepristone, but had not yet taken misoprostol, and were interested in "reversing" mifepristone's effects.

130.   A total of 547 women met inclusion criteria and underwent progesterone treatment within 72 hours after taking mifepristone.[34]

131.   The overall success rate—247 live births, plus four viable pregnancies lost after 20 weeks gestation—was 48%.[35]

132.   The 2018 study showed even higher success rates when the patients were divided into treatment subgroups.

---

[33] Shingo Yamabe et al., *The effect of RU486 and progesterone on luteal function during pregnancy*, 65 FOLIA ENDOCRINOLOGICA JAPONICA 497 (1989). A true and accurate copy is attached as Ex. O.

[34] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 ISSUES L. & MED. 21, 24-25 (2018). A true and accurate copy is attached as Ex. P. The 2018 study followed a 2012 case report, also published by Drs. Delgado and Davenport, that followed seven women who had taken mifepristone and then received progesterone therapy after "s[eeking] assistance to block the mifepristone effects." George Delgado et al., *Progesterone use to reverse the effects of mifepristone*, 46 ANNALS PHARMACOTHERAPY 1723, 1723 (2012). A true and accurate copy is attached as Ex. Q. Four of the six women who completed the study were able to carry their pregnancies to term.

[35] Delgado et al., *A Case Series*, *supra* note 34, at 25-26.

133.    It showed fetal survival rates of 64% for the subgroup that received progesterone intramuscularly and 68% for the subgroup that received a high dose of oral progesterone followed by daily oral progesterone until the end of the first trimester.[36]

134.    The survival rates in the 2018 study compare favorably with the baseline fetal survival rate of approximately 25% if no treatment is attempted after mifepristone is administered.[37]

135.    The 2018 study found no increased risk of birth defects after progesterone treatment. And the rate of preterm delivery was 2.7%, compared with a 10% average in the general population in the United States.[38]

136.    As a result, the 2018 study recommended a protocol to "reverse" the effects of mifepristone by administering progesterone, either orally or by intramuscular injection, "as soon as possible" after taking mifepristone, followed by supplemental progesterone until the end of the first trimester if taken orally or a series of additional intramuscular injections.[39]

137.    The 2018 study properly used a historical control group, rather than a randomized controlled trial, because it would be unethical to administer a placebo to a pregnant woman seeking to reverse mifepristone's feticidal effects when evidence shows progesterone is safe and effective to do this.

---

[36] *Id*. at 26.

[37] *Id*.; *see also* Davenport et al., *supra* note 22.

[38] Delgado et al., *A Case Series*, *supra* note 34, at 26.

[39] *Id*. at 29.

138.    A rat study published in July 2023 further indicates "a clear progesterone-mediated reversal of an initiated mifepristone-induced termination in a rat model at first-trimester human equivalent."[40]

139.    Results indicate that progesterone treatment following initiation of mifepristone-induced pregnancy termination "reversed" the process in 81% of rats that were administered mifepristone and progesterone.

140.    Another study published in July 2023 shows "no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy," and concludes that "mifepristone antagonization with progesterone is a safe and effective treatment."[41]

141.    Pro-life pregnancy centers have witnessed numerous successful incidents of progesterone treatment resulting in continued pregnancies, such as that of Maranda and Myli'anna, and other evidence shows that the APR protocol works as intended.[42]

142.    Yale School of Medicine scientist Dr. Harvey Kliman—who favors expansive abortion policy—has explained that if one of his daughters accidentally

---

[40] Christina Camilleri & Stephen Sammut, *Progesterone-mediated reversal of mifepristone-induced pregnancy termination a rat model: an exploratory investigation,* 13 SCIENTIFIC REPORTS 10942 (2023). A true and accurate copy is attached as Ex. R.

[41] Paul L.C. DeBeasi et al., *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, 90 THE LINACRE QUARTERLY 395 (July 2023). A true and accurate copy is attached as Ex. S.

[42] *E.g.*, *2022 Impact Report*, HEARTBEAT INTERNATIONAL, https://perma.cc/6AWX-GF87; Fox 11 Los Angeles, *Woman shares story of abortion pill reversal*, YOUTUBE (May 4, 2022), https://perma.cc/2S39-JQGX; Heartbeat International, *Sarah's Story*, VIMEO (Sept. 22, 2023), https://vimeo.com/867342614; Heartbeat International, *Krystle's APR Story*, VIMEO (Sept. 29, 2023), https://vimeo.com/869600792; Heartbeat International, *Sara's Story*, VIMEO (Sept. 16, 2023), https://vimeo.com/865197386.

took mifepristone during pregnancy, "he would tell her to take 200 milligrams of progesterone three times a day for several days," and "I bet you it would work."[43]

### III.   New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349 and 350

143.   New York Executive Law § 63(12) authorizes the attorney general to bring an action against "any person" who engages in "repeated fraudulent or illegal acts or otherwise demonstrate[s] persistent fraud or illegality in the carrying on, conducting or transaction of business."

144.   Section 63(12) includes the following definitions:

    a.    The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions.

    b.    The term "persistent fraud" or "illegality" as used herein shall include continuance or carrying on of any fraudulent or illegal act or conduct.

    c.    The term "repeated" as used herein shall include repetition of any separate and distinct fraudulent or illegal act, or conduct which affects more than one person.

145.   Section 63(12) does not include any additional definitions or guidance as to what constitutes "carrying on, conducting[,] or transaction of business" or "such business activity," nor does it define what is actionable "deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

146.   New York General Business Law Article 22-A, § 349(a) declares unlawful all "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

---

[43] Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal,'* THE NEW YORK TIMES MAGAZINE (July 18, 2017), https://perma.cc/CGV2-M8J6.

147.   Section 349(b) authorizes the attorney general to bring an action in the name of the people of the state of New York whenever she "believe[s] from evidence satisfactory to [her] that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful" in subsection (a).

148.   Section 349 does not define what constitutes "deceptive acts or practices."

149.   Section 349 does not define what evidence is sufficient to establish an unlawful practice.

150.   Section 349 gives the attorney general complete discretion to determine what "evidence" is "satisfactory" to institute an action alleging a violation of the statute.

151.   New York General Business Law Article 22-A, § 350 states that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

152.   Section 350-a defines "false advertising" to mean "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect."

153.   Section 350-a requires the attorney general to "take[] into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

154.    The law does not describe what "other things" shall be taken into account.

155.    Section 350 does not define what it means to be "misleading in a material respect," except with respect to "the advertising of an employment opportunity." The Attorney General has complete discretion to determine what she believes to be materially misleading with respect to advertising of a commodity and to institute an action based on that belief.

## IV.   Attorney General James's Censorship Campaign Against Pregnancy Centers

156.    The Attorney General has concocted an unconstitutional and expansive interpretation of the Business Fraud Statutes to institute aggressive proceedings against pro-life pregnancy centers for their truthful statements about progesterone treatment.

157.    On April 22, 2024, the Attorney General invoked her consumer protection authority under the Business Fraud Statutes against eleven faith-based, pro-life pregnancy centers and Heartbeat International, a network of affiliated centers, by issuing Notices of Intention to Sue for their speech about "Abortion Pill Reversal." *See*, *e.g.*, Ex. A.

158.    The Attorney General accused those centers of making "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ("APR") protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol." *Id.*

159.    The Attorney General threatened those centers with "injunctive relief, restitution, damages, civil penalties, auditing and compliance review, costs, and such other relief as the court may deem just and proper." *Id.*

160.   She carried out this threat by instituting a civil enforcement action in New York County against those centers on May 6, 2024, seeking the above relief, including civil penalties, costs, and attorneys' fees.[44]

161.   The Attorney General is using the power of the State to censor viewpoints she disfavors about progesterone treatment.

162.   The Attorney General has not identified in her Notices of Intention to Sue or in her legal action to enforce the Business Fraud Statutes any consumer who has been misled by the statements she alleges are false and misleading.

163.   Nor has the Attorney General identified any person who has been harmed by the statements she alleges are false and misleading.

164.   The Attorney General's application of the Business Fraud Statutes to pro-APR expression appears to be based on a bare desire to harm and censor pro-life and religious viewpoints and to impede women's access to information that could help them continue their pregnancies and save their babies' lives.

## V.   Plaintiffs' Speech is Chilled by the Attorney General's Censorship Campaign

165.   Like the faith-based, pro-life pregnancy centers named as defendants in the Attorney General's May 6, 2024, lawsuit, Plaintiffs are faith-based, pro-life pregnancy centers that have made or would like to make statements about the safety and effectiveness of progesterone treatment for women who do not wish to complete a chemical abortion.

166.   All of the statements Plaintiffs have made and would like to make about progesterone treatment are true, supported by science, and not misleading.

---

[44] *People of the State of New York v. Heartbeat Int'l, Inc., et al*, Index No. 451314/2024 (N.Y. Sup. Ct., N.Y. County, May 6, 2024). A true and accurate copy is attached hereto as Ex. T.

167.    Plaintiffs have self-censored their statements about progesterone treatment because of AG James's actions against these other centers, depriving mothers in their communities of potentially life-saving information and a true opportunity to choose their desired outcomes for their pregnancies.

***NIFLA and its Members***

168.    NIFLA has spoken, and wishes to continue speaking, about progesterone treatment.

169.    Prior to the Attorney General's censorship campaign against pro-life pregnancy centers, most of NIFLA's New York members made public statements about progesterone treatment or offered referrals to physicians who could provide the treatment as a free service to women who have knowingly taken—or were tricked or coerced into taking—mifepristone but did not wish to have an abortion or had changed their minds and wished to continue their pregnancies.

170.    Upon receiving or hearing of the Attorney General's Notices of Intention to Sue, several of NIFLA's New York members removed their statements about progesterone treatment from their online and print materials, despite the truth and accuracy of the statements, and despite their faith-based desire to continue making them.

171.    NIFLA members Gianna's House and Options Care Center, fearing the gathering momentum of the Attorney General's campaign against other pro-life pregnancy centers, have removed statements or refrained from making new statements about progesterone treatment, fearing similar retaliatory action and punishment.

172.    Prior to the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, NIFLA made various statements about progesterone treatment to its New York members.

173.    Some of NIFLA's and its members' statements are identical or nearly identical to—and others were substantially similar to—the statements made by the faith-based, pro-life pregnancy centers that have been sued by the Attorney General.

174.    The Attorney General's lawsuit against other New York centers alleges that using the term "Abortion Pill Reversal"—by which she means the protocol of administering progesterone to curb and outlast the effects of mifepristone—is false and misleading in violation of the Business Fraud Statutes.[45]

175.    The Attorney General's lawsuit against other centers also alleges that linking to abortionpillreversal.com or the APR Hotline through the Abortion Pill Rescue Network is false and misleading in violation of the Business Fraud Statutes.

176.    NIFLA used the term "Abortion Pill Reversal" and when it used that term, NIFLA referred to the protocol of administering progesterone to curb and outlast the effects of mifepristone.

177.    NIFLA also advised its New York members to use the training program of Abortion Pill Rescue through Heartbeat International, linking abortionpillreversal.com and the APR Hotline.

178.    Prior to the Attorney General's censorship campaign, NIFLA also published informational guides called "Clinic Tips," regularly consulted with centers, and provided sample policies that encouraged its members to speak about progesterone treatment and provide it as part of their services.

179.    Attached as Exhibit AA is a true and accurate copy of materials NIFLA has provided and would like to continue to provide to its New York members.

---

[45] Ex. T at ¶¶ 99–104, 111.

180.   The Attorney General's lawsuit specifically alleges that Heartbeat International violated the Business Fraud Statutes by making the following statements on their websites:

      a.  "Do you regret your decision and wish you could **reverse the effects** of the abortion pill?"[46]

      b.  "There is an effective process called abortion pill reversal* that can **reverse the effects** of the abortion pill and allow you to continue your pregnancy, but **time is of the essence**."[47]

181.   NIFLA shared the testimony of a woman who sought "medication and support to **reverse the effect** of the abortion procedure she had begun" and offered "[t]ips for pregnancy centers regarding use of progesterone therapy to serve women who want to **reverse the effects** of mifepristone."

182.   Like Heartbeat International, NIFLA also stated that "**time is of the essenc**e for effectiveness" and linked to abortionpillreversal.com.

183.   NIFLA has since removed the above statements about progesterone treatment for fear of punishment.

184.   The Attorney General's lawsuit also generally alleges that pregnancy centers violate the Business Fraud Statutes by creating the "overall impression" that "APR has been proven to be safe" and "is an accepted and uncontroversial medical treatment."[48]

185.   Like the centers AG James has sued, NIFLA stated that "[p]rogesterone has been used safely in pregnancy for over 40 years," and that "facts and science support APR."

---

[46] Ex. T at ¶ 112
[47] Ex. T at ¶ 113 (emphasis added).
[48] Ex. T at ¶ 10.

186.    The Attorney General's suit against other centers clearly shows that she considers NIFLA's similar statements to be in violation of the Business Fraud Statutes.

187.    NIFLA believes its statements about progesterone treatment are not false or misleading but has removed those statements and stopped advising its centers in New York to offer progesterone treatment (unless they are already offering it) for fear of retaliation and punishment by the Attorney General.

188.    For the same reasons, NIFLA has also stopped advising its New York centers to advertise for or make statements about progesterone treatment.

189.    NIFLA would like to resume using the term "Abortion Pill Reversal," linking to abortionpillreversal.com and the APR Hotline, making its prior statements about progesterone treatment, and advising its New York members about the same.

190.    If not for the threat of enforcement of the Business Fraud Statutes, NIFLA would re-publish its self-censored statements and continue advising its New York members about progesterone treatment.

191.    Not advising its centers to offer or advertise for these services undermines the mission of NIFLA to promote life-saving alternatives to abortion.

192.    NIFLA has expended organizational resources to change its advice to members because of the threat of litigation from the Attorney General.

193.    The threat of litigation against its members for their speech about progesterone treatment has also forced NIFLA to expend resources advising members in New York that it otherwise would have spent on promoting its mission.

194.    For example, because NIFLA has had to divert and expend resources advising its New York members about the Attorney General's unlawful use of the Business Fraud Statutes, it has been unable to answer incoming member questions

or prepare memoranda on pending legal and medical issues unrelated to this lawsuit.

195.    NIFLA members' statements about and referrals for progesterone treatment are a direct extension of their religious belief that life begins at conception.

196.    All Plaintiffs' pro-life statements and beliefs in support of progesterone treatment are sincere and rooted in their Christian faith.

197.    Plaintiffs sincerely believe that human life begins at conception.

198.    Plaintiffs sincerely believe that it is their religious duty to inform women and resource centers of options that may save an unborn human life, including about the option of progesterone treatment.

### Gianna's House

199.    Prior to the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, Gianna's House made various statements about progesterone treatment on its websites and in its newsletter.

200.    Some of these statements were identical or nearly identical to—and others were substantially similar to—the statements made by the faith-based, pro-life pregnancy centers that have been sued by the Attorney General.

201.    The Attorney General's lawsuit against other centers alleges that using the term "Abortion Pill Reversal"—by which she means the protocol of administering progesterone to curb and outlast the effects of mifepristone—is false and misleading in violation of the Business Fraud Statutes.

202.    The Attorney General's lawsuit against other centers also alleges that linking to the abortionpillreversal.com or the APR Hotline through the Abortion Pill Rescue Network is false and misleading in violation of the Business Fraud Statutes.

203.    Gianna's House used the term "Abortion Pill Reversal," and when it used that term, Gianna's House referred to the protocol of administering progesterone to curb and outlast the effects of mifepristone.

204.    Gianna's House also linked to the Abortion Pill Rescue Network landing page.

205.    The Attorney General's lawsuit specifically alleges that Care Net of Wayne County violated the Business Fraud Statutes by making the following statement on its website: "If you have recently taken the first pill [mifepristone] and decided not to take the second [misoprostol], please contact Abortion Pill Reversal," followed by a link to abortionpillreversal.com.[49]

206.    The Attorney General's lawsuit specifically alleges that Caring Choices violated the Business Fraud Statutes by making the following statement on its website: "If you have recently taken the first pill and decided not to take the second, please contact Abortion Pill Reversal," followed by a link to abortionpillreversal.com.[50]

207.    The Attorney General's lawsuit specifically alleges that Bridge Women's Support Center violated the Business Fraud Statutes by making the following statement on its website: "If you've recently taken the first dose of the abortion pill and change your mind about your decision, contact Abortion Pill Reversal today. It may be possible to continue a healthy pregnancy," followed by a link to abortionpillreversal.com.[51]

208.    On its Abortion Information webpage, which offers support to women considering an abortion, Gianna's House previously stated, "[i]f you have recently

_____

[49] Ex. T at ¶ 215.

[50] *Id.* at ¶ 247.

[51] *Id.* at ¶ 253.

taken the abortion pill and are having regret, it may be possible to undo the effects of abortion drugs. Learn more here." That statement also previously included links to the Abortion Pill Rescue Network[52] landing page at abortionpillreversal.com, the same page to which the defendant pregnancy centers in AG James's suit were linked. Ex. V, Gianna's House Abortion Information.

209.    On May 7, 2024, the day after the Attorney General sued the other centers, Gianna's House removed this reference to progesterone treatment and the Abortion Pill Reversal Network from its website.

210.    Accordingly, women who have changed their minds after starting a chemical abortion and wish to try to save their pregnancy cannot find any help on the Gianna's House website.

211.    The Attorney General's suit against the other centers clearly shows that she considers Gianna's House's similar statements to be in violation of the Business Fraud Statutes.

212.    Gianna's House believes its statements about progesterone treatment are not false or misleading but has removed those statements for fear of retaliation and punishment by the Attorney General.

213.    Gianna's House would like to resume using the term "Abortion Pill Reversal," linking to abortionpillreversal.com, and making its prior statements about progesterone treatment. It would also like to share stories from women who have successfully undergone progesterone treatment to save their babies.

---

[52] The Abortion Pill Rescue Network, through Heartbeat International, connects women who have taken the first dose of the abortion pill to a network of medical professionals trained to administer the Abortion Pill Reversal protocol. *See Abortion Pill Rescue Network*, HEARTBEAT INTERNATIONAL, https://perma.cc/Y5DH-T6S5.

214.    If not for the threat of enforcement of the Business Fraud Statutes by AG James, Gianna's House would re-publish its self-censored statements about progesterone treatment.

215.    Gianna's House would also like to make additional statements about progesterone treatment such as, but not limited to, the following:

a.    "Have you taken the first dose of the abortion pill? Do you regret your decision and wish you could reverse the effects of the abortion pill? We're here for you!"[53]

b.    "There is an effective process called abortion pill reversal* that can reverse the effects of the abortion pill and allow you to continue your pregnancy, but time is of the essence.... *APR has been shown to increase the chances of allowing the pregnancy to continue. However, the outcome of your particular reversal attempt cannot be guaranteed."[54]

c.    "Progesterone is the natural hormone in a woman's body that is necessary to nurture and sustain a pregnancy. The first pill in the abortion pill regimen blocks progesterone's actions. By giving extra progesterone, we hope to outnumber and outcompete the first abortion pill in order to reverse the effects and provide an opportunity to save the pregnancy."[55]

d.    "Progesterone, used in the reversal process, has been safely used in pregnancy for over 50 years. Initial studies have found that the birth defect rate in babies born after the APR is less or equal to the rate in the general population."[56]

e.    "For some women progesterone may cause sleepiness, lack of energy, lightheadedness, dizziness, gastrointestinal discomfort and headaches. Increased fluid intake might help relieve these symptoms. It is important that you follow all of the instructions

---

[53] ABORTION PILL REVERSAL, https://abortionpillreversal.com/.

[54] *Overview*, ABORTION PILL REVERSAL, https://perma.cc/4AFK-QPWF.

[55] *Id.*

[56] *Id.*

of your APR provider carefully. If you have any questions, contact your provider."[57]

***Options Care Center***

216.    Prior to the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, Options Care Center made several statements about progesterone treatment on its website and social media platforms, as well as in print materials.

217.    Some of these statements were identical or nearly identical to—and others are substantially similar to—the statements made by the faith-based, pro-life pregnancy centers that have been sued by the Attorney General.

218.    The Attorney General's lawsuit against other centers alleges that using the term "Abortion Pill Reversal"—by which she means the protocol of administering progesterone to curb and outlast the effects of mifepristone—is false and misleading in violation of the Business Fraud Statutes.

219.    The Attorney General's lawsuit against other centers also alleges that linking to abortionpillreversal.com or the APR Hotline through the Abortion Pill Rescue Network is false and misleading in violation of the Business Fraud Statutes.

220.    Options Care Center used the term "Abortion Pill Reversal," and when it used that term, Options Care Center referred to the protocol of administering progesterone to curb and outlast the effects of mifepristone.

221.    Options Care Center also linked to the Abortion Pill Rescue Network landing page.

222.    The Attorney General's lawsuit against other centers specifically alleges that CompassCare violated the Business Fraud Statutes by publishing a

---

[57] *Id.*

35

video that uses the phrase, "progesterone therapy has been used to prevent spontaneous abortion, also known as miscarriage, since the 1950s."[58]

223.   Options Care Center previously made similar statements in its Abortion Pill FAQ that "[r]eversal is possible if action is taken after the first dose. Since mifepristone cuts off progesterone, introducing it again has been known to reverse the effects. Progesterone has been used to support pregnancies in danger of miscarriage for decades. If you have recently taken the first dose (mifepristone) and decided not to take the second, please contact [the Abortion Pill Reversal Network]. While the outcome of your particular pregnancy cannot be guaranteed, according to initial studies, the reversal process is 64-68% effective if taken within the first 24-72 hours." Options Care Center listed various sources for this information.

224.   Options Care Center also disseminated postcards making similar statements about the history of the use of progesterone treatment to explain how it works.

225.   The postcard stated that "Progesterone … has been used to support pregnancies with a risk of miscarriage for decades" and that "[i]f you've taken the first [chemical abortion] pill and had doubts or changed your mind, you still have a chance to save your pregnancy!" It further clarified that "[t]he abortion pill reversal is 64-68% effective when taken 24-48 hours after the first abortion pill. It has been known to be effective if taken up to 72 hours in some cases. The sooner you take it, the better your chances of saving your baby."

226.   On January 4, 2021, Options Care Center tweeted on the social media platform X—formerly known as Twitter—that "[i]f a woman changes her mind after taking the first abortion drug, she may be able to save her baby through abortion pill reversal," Ex. W, linking to a story in Pregnancy Help News in which a woman

---

[58] Ex. T at ¶ 180.

successfully saved her baby using progesterone treatment.[59] After the Attorney General brought her suit against other pregnancy centers, Options Care Center deleted this post.

227.    The Attorney General's lawsuit against other centers alleges that Heartbeat International and Soundview Pregnancy Services violated the Business Fraud Statutes for using the phrase, "It may not be too late," with regard to progesterone therapy to stop a chemical abortion.[60]

228.    Options Care Center made a similar statement on small cards that include a QR code to the Abortion Pill Rescue Network website. Prior to the Attorney General's censorship campaign, Options Care Center distributed these cards throughout the community to reach women in need of support and spread awareness about progesterone treatment.

229.    In addition to a QR code, the cards supplied a phone number to the Abortion Pill Reversal Hotline and stated that "[o]ur nurses are ready and waiting to help!" The cards also featured two dialogue boxes. The first said, "I regret taking the abortion pill." The second answered, "It may not be too late."

230.    As a result of the Attorney General's censorship campaign against faith-based, pro-life pregnancy centers, Options Care Center has removed all of its statements about progesterone treatment from its digital and print platforms and has since stopped disseminating its postcards and other cards around the community for fear of retaliation and punishment by the Attorney General, despite the truth of the statements and a strong, faith-based desire to continue making them.

---

[59] *See* Katie Franklin, *Missouri mom reverses chemical abortion amidst pandemic lockdown, saves unborn baby*, PREGNANCY HELP NEWS (June 15, 2020), https://perma.cc/ZZ6L-A429.

[60] Ex. T at ¶¶ 132, 188.

231.    Options Care Center would like to resume using the term "Abortion Pill Reversal," linking to the abortionpillreversal.com, and making its prior statements about progesterone treatment.

232.    The Attorney General's lawsuit against other centers clearly shows that she considers Options Care Center's similar statements to be in violation of the Business Fraud Statutes.

233.    If not for the threat of enforcement of the Business Fraud Statutes by the Attorney General, Options Care Center would re-publish its self-censored statements about progesterone treatment.

234.    Options Care Center also prepared the following statements to post on their website communicating to prospective and current supporters, friendsofocc.com, under the heading "Abortion Pill Reversal," but it has not posted the statements for fear of retaliation and punishment:

a.   "The abortion pill (RU486, chemical abortion) consists of 2 pills. The first, Mifepristone, cuts off progesterone, a naturally occurring hormone that helps provide nourishment and oxygen to the growing baby. Mifepristone accomplishes this by latching to the same receptors that progesterone connects to and blocking progesterone from also connecting. The second pill, Misoprostol, causes cramping that expels the baby. Abortion Pill Reversal is the simple process of introducing supplemental progesterone to overwhelm the Mifepristone and reach the receptors blocked by that abortion pill. This has been known to be between 64-68% effective if taken within 24-72 hours after the patient takes the first abortion pill. Results are not guaranteed. Call 877-558-0333 or go to Abortionpillreversal.com if you or someone you know has taken the first abortion pill and changed her mind."

b.   "In addition to referring for onsite ultrasound, which would be offered each week during the APR process, the partnering medical services provider would assist with any medication needed throughout the process."

235.    Options Care Center would make these and other similar statements if it were not for the Attorney General's enforcement of the Business Fraud Statutes

against the other faith-based, pro-life pregnancy centers that make the same or other substantially similar statements.

236.    Thus, NIFLA, its members, and the individual Plaintiffs' speech has been censored by the Attorney General's' application of the Statutes to their expression about progesterone treatment.

## VI.    The Attorney General's Advocacy for Unlimited Abortion, Hostility Towards Pro-Life Pregnancy Centers, and Disparate Treatment of Pro-Life Viewpoints

237.    The Attorney General has targeted pro-life centers for disfavored treatment because of their pro-life and religious viewpoints.

238.    Plaintiffs do not believe that their past statements about progesterone treatment violate a proper understanding of New York law. But the State believes differently as shown by the Attorney General's decision to sue other centers for making the same or similar statements in support of progesterone treatment.

239.    The Attorney General has zealously advocated for expansive abortion policies and engaged in a lengthy and persistent campaign of using public office to target pro-life pregnancy centers for harassment and intimidation that predates her tenure as attorney general.

240.    The Attorney General desires to be a prominent national advocate for abortion, and she refers to the current national debate over abortion as "one of the greatest fights we will ever have."[61]

241.    The Attorney General strategically works to impose her abortion policy preferences on other states and thwart their efforts to provide legal protections for the unborn.[62]

---

[61] NY AG James (@NewYorkStateAG), X (May 3, 2022, 8:44 PM), https://perma.cc/2BUP-CJJZ.

[62] *E.g.*, NY AG James (@NewYorkStateAG), X (May 3, 2022, 11:17 AM) , https://perma.cc/X9N7-LC69 (touting her efforts to oppose abortion regulations in

242.    She is transparent about her affinity for organizations that advocate for or perform abortions such as Planned Parenthood NYC PAC, for which she appeared as she campaigned for attorney general in 2018[63] and *as* attorney general in 2019,[64] and Planned Parenthood of Greater New York, for which she attends fundraisers *as* attorney general, lending her image for portraits holding signs that say "I ♥ PPGNY."[65]

243.    Before entering office, the Attorney General was New York City's Public Advocate, and in that role, she displayed her hostility toward pro-life pregnancy centers by denigrating such centers as "fake clinics" and steering women seeking reproductive health and pregnancy services to what she called "legitimate health care providers," by which she meant facilities "that offer…abortion."[66]

244.    While campaigning to become attorney general in 2018, then-candidate James promised that, if elected, her abortion activism would include "launching investigations" against individuals expressing pro-life views.[67]

---

Mississippi, Texas, Arizona, Arkansas, Oklahoma, Alabama, and South Carolina); NY AG James (@NewYorkStateAG), X (Jan. 28, 2020, 5:19 PM), https://perma.cc/6EDW-D95Y ("I'm taking legal action against several state restrictions in Missouri that would significantly curtail women's rights & deny their ability to have safe, legal abortions.").

[63] Ben Max & Ben Brachfeld, *The Week Ahead in New York Politics, September 24*, GOTHAM GAZETTE, (Sep. 23, 2018), https://perma.cc/34MU-64A4.

[64] PPNYC Votes PAC, *Planned Parenthood NYC Votes PAC Raises $225,000 to Strengthen Sexual & Reproductive Health Care in New York*, PR NEWSWIRE, (Oct. 23, 2019), https://perma.cc/XWU6-REG5.

[65] Conçetta Ciarlo, *Planned Parenthood of Greater NY Hosts its Spring Into Action Gala*, VOGUE, (Mar. 14, 2023), https://perma.cc/6M6N-7JWN.

[66] Letitia James & Andrea Miller, *With Fake Clinics Proliferating, New Yorkers Should Know Their Reproductive Health Care Rights*, GOTHAM GAZETTE, (Sep. 24, 2018), https://perma.cc/6AMY-82DQ.

[67] Jillian Jorgensen, *AG candidate Letitia James would seek broad authority to prosecute those who block abortion clinics*, NEW YORK DAILY NEWS, (Jul. 26, 2018), https://perma.cc/3QE7-EYQC.

245.    Then-candidate James specifically "called for investigations into so-called 'crisis pregnancy centers,'" which "counsel women against terminating their pregnancies."[68]

246.    Then-candidate James even specified in 2018 the basis under which she would launch future investigations of pro-life pregnancy centers, saying "she'd investigate whether the centers were committing fraud," adding that the centers' status as nonprofits meant they "would…be in her purview to investigate."[69] *Id.*

247.    In 2018, then-candidate James also penned an editorial in which she derided pro-life pregnancy centers like Options Care Center and Gianna's House as "fake women's health centers," accusing them of "lying to women and giving false information in order to prevent women from having abortions."[70]

248.    She wrote that "[f]ake clinics actively trick and lure women into their centers," and she contrasted them with "legitimate health care providers."[71]

249.    Among the allegedly deceptive actions pro-life pregnancy centers take, then-candidate James wrote that they may "brand themselves with words like 'women's choices' or 'pregnancy centers,'" "advertise free pregnancy tests and ultrasounds," and "look and feel like a real doctor's office" with staff who "wear white coats or medical scrubs."[72] She did not explain why pro-life medical professionals at pro-life pregnancy centers should dress differently than those at abortion facilities.

250.    Without naming any offenders or citing any evidence, then-candidate James wrote that pro-life pregnancy centers "lie to women, either telling them that

---

[68] *Id.*

[69] *Id.*

[70] *Supra* note 66.

[71] *Id.*

[72] *Id.*

they are farther along in their pregnancy than they really are, and that it is too late for an abortion or that it is earlier in pregnancy than they really are, and they should wait before making any decisions."[73]

251.   Then-candidate James also targeted pro-life pregnancy center associations, such as NIFLA and Heartbeat International (which she sued on May 6, 2024), asserting that "[f]ake clinics are often part of national anti-abortion networks."[74]

252.   She did not explain why associations of mission-aligned pregnancy centers should be any more concerning than abortion facilities that affiliate with national pro-abortion networks like Planned Parenthood, the National Network of Abortion Funds, or the National Abortion Federation.

253.   The Attorney General currently uses her official website to criticize pro-life pregnancy centers, dissuade women seeking reproductive health care or prenatal services from seeking their assistance, and provide as an alternative a link to a "useful clinic finding guide" from the National Network of Abortion Funds.[75]

254.   The Attorney General's link to the National Network of Abortion Funds greets readers in large bold font with a "warning" about "fake clinics [that] offer free pregnancy tests or ultrasounds," stating that "the people performing these services aren't doctors," that "[t]he people there will give you false, medically inaccurate information about the risks or costs of abortion," and that "[t]hey will try to convince you not to have an abortion."[76]

---

[73] *Id.*

[74] *Id.*

[75] *Reproductive Rights*, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, https://perma.cc/6RCA-Q4NU (last visited May 23, 2024).

[76] *Find a Clinic You Can Trust*, NATIONAL NETWORK OF ABORTION FUNDS, https://perma.cc/6E65-BTKR (last visited May 23, 2024).

255.    The Attorney General's official website instructs readers to not "share any personal information" with a center that is not "a real health care facility that offers abortion services or referrals."[77]

256.    The Attorney General's guidance on reproductive rights describes pregnancy centers as "[f]ake clinics."[78]

257.    Contrary to the plain language of *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) and the U.S. Constitution, the Attorney General frequently refers to abortion as a "fundamental right"[79]; she called *Dobbs* a "vicious decision" and "one of the darkest moments in the history of this nation."[80]

258.    Within weeks of the leak of a draft of the *Dobbs* decision on May 2, 2022,[81] churches, political organizations, and pro-life pregnancy centers faced violence, including fire-bombings and vandalism.[82]

---

[77] *See supra* note 75.

[78] Attorney General Letitia James, *How New York protects your right to reproductive health care*, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, https://perma.cc/KFU6-MYAS.

[79] *E.g.*, NY AG James (@NewYorkStateAG), X (Mar. 9, 2023, 1:38 PM), https://perma.cc/HU38-P8F6 ("Abortion is ... a fundamental right."); NY AG James (@NewYorkStateAG), X (Jun. 24, 2022, 10:18 AM), https://perma.cc/Q8YN-7MYF (decrying other states' decisions to "strip away the fundamental right to choose."); NY AG James (@NewYorkStateAG), X (Jun. 3, 2022, 12:35 PM), https://perma.cc/227H-AU5H (pledging to defend the "fundamental right to choose.").

[80] NY AG James (@NewYorkStateAG), X (Jun. 24, 2022, 10:18 AM), https://perma.cc/84M8-TX3X.

[81] Geoff Mulvihill, *Abortion is still consuming US politics and courts 2 years after a Supreme Court draft was leaked*, ASSOCIATED PRESS, (May 2, 2024), https://perma.cc/PDV8-VF9S.

[82] Jonah McKeown, *TRACKER: Pro-abortion attacks in the U.S. continue (updated)*, CATHOLIC NEWS AGENCY, (Jul. 21, 2022), https://perma.cc/CV4N-YGKB. *See also, e.g.*, WCCO News Staff, *Vandals target Minneapolis pregnancy center*, CBS NEWS, (Mar. 4, 2023), https://perma.cc/YUG3-TFQZ; Francis X. Donnelly, *Pro-life pregnancy center in Eastpointe, board member's house spray-painted with graffiti*,

259.    Pro-life churches and pregnancy centers in New York were targeted in this campaign of violence, including a center in Buffalo, not far from Plaintiff Options Care Center in Jamestown.[83]

260.    Rather than protecting pro-life pregnancy centers from violence, the Attorney General has used her status as attorney general of one of the most economically powerful states in the Union to influence major corporations to discriminate against pro-life pregnancy centers, such as in 2022 when she pressured Google "to distinguish between facilities that offer abortion services and those that do not."[84]

261.    In a press release announcing her efforts to pressure Google to marginalize pro-life pregnancy centers, the Attorney General included statements from Georgana Hanson, president and CEO of Planned Parenthood Empire State Acts, and Mini Timmaraju, president of NARAL Pro-Choice America, now known as Reproductive Freedom for All, both of whom endorsed this pressure on Google.[85]

262.    The Attorney General further used the influence of her official social media profile on X, which is followed by more than a half million users, to push Google to steer its users away from pro-life pregnancy centers because those centers

---

THE DETROIT NEWS, (Dec. 17, 2022), https://perma.cc/WC68-JRXH; Luke Vander Ploeg & Addison Lathers, *Anti-Abortion Group in Wisconsin Is Hit by Arson, Authorities Say*, THE NEW YORK TIMES, (May 9, 2022), https://nyti.ms/4bSKezq.

[83] Anna Skinner, *Shadowy Group Jane's Revenge Claims Attacks on Anti-Abortion Targets*, NEWSWEEK, (Oct. 21, 2022), https://perma.cc/XGY8-UKY4; Larry Celona, Tina Moore, and Amanda Woods, *Graffiti on NYC church warns: 'If abortion isn't safe, neither are you*, NEW YORK POST, (Jun. 27, 2022), https://perma.cc/88T8-VYEB; Ed Pilkington, *Fire at New York anti-abortion facility investigated as suspected arson*, THE GUARDIAN, (Jun. 8, 2022), https://perma.cc/3BZC-TWDV.

[84] Press Release, Office of the New York State Attorney General, Attorney General James Calls on Google to Address Dangerous Amplification of Fake Pregnancy Centers (Jun. 29, 2022), https://perma.cc/2GNT-DNJ5.

[85] *Id.*

"exist to discourage people from having an abortion and they don't offer health care services," adding "@Google must fix this issue immediately."[86]

263. The Attorney General's pressure campaign worked: she announced that she successfully caused the tech giant Google to attach derogatory labels on its map results to discourage users from visiting pro-life pregnancy centers.[87] "In June, I called on @Google to fix its @googlemaps search results to stop directing people to anti-abortion clinics known as crisis pregnancy centers," the Attorney General boasted, "and today Google is doing just that."[88]

264. She similarly supported the practice of the crowd-sourced business review website Yelp to single out pro-life pregnancy centers for negative reviews based on the fact that they provide pregnancy support but not abortions.[89]

265. In October 2023, recognizing the influence attorneys general have through state consumer protection laws, Attorney General James and 15 other attorneys general signed an open letter pledging to use their authority under those statutes against pro-life pregnancy centers.[90]

266. In the letter, the Attorney General criticized centers that do not offer abortion, specifically targeted progesterone treatment as "an unproven and potentially risky medical protocol," and made profoundly misleading assertions

---

[86] NY AG James (@NewYorkStateAG), X (Jun. 29, 2022, 4:50 PM), https://perma.cc/5FAS-MQ3K.

[87] Press Release, Office of the New York State Attorney General, Attorney General James Applauds Google for Improving Search Results for Individuals Seeking Abortion Care (Aug. 25, 2022), https://perma.cc/LB65-QD2G.

[88] NY AG James (@NewYorkStateAG), X (Aug. 25, 2022, 4:06 PM), https://perma.cc/H9JC-KNCH.

[89] Attorney General Rob Bonta, State of California Office of the Attorney General, Open Letter from Attorneys General Regarding CPC Misinformation and Harm (Oct. 23, 2023), https://perma.cc/4SA5-9FXD.

[90] *Id.*

about a study of the use of progesterone to halt the progress of a chemical abortion.[91]

267.    The Attorney General further pledged in the letter that she would "take numerous actions aiming to mitigate the harmful effects of [pregnancy centers'] misinformation and delays."[92]

268.    Asserting those powers as promised, the Attorney General has now sued faith-based, pro-life pregnancy centers that offer progesterone treatment to women who change their mind after starting a chemical abortion.

269.    In that lawsuit, the Attorney General alleges that the centers have made "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ("APR") protocol, including…statements and omissions relating to the safety and efficacy of the APR protocol." Ex. T.

270.    In her Complaint, the Attorney General describes the centers as "opponents of abortion" who "seek to deter pregnant individuals who have begun the process of a medical abortion from completing that process." *Id.*

271.    Ironically, the Attorney General has repeatedly and persistently acclaimed the *safety and efficacy* of the most common two-drug chemical abortion protocol—especially the first drug, mifepristone—while *omitting* any of the voluminous warnings the FDA mandates be provided by prescribing physicians to their patients.

---

[91] *Id.* The letter falsely implied that the mere *study* of APR sent three study participants to the hospital by ambulance for "severe vaginal bleeding." *Id.* This is grossly misleading: in the study, two of three women who needed emergency treatment for hemorrhaging had received a placebo, not progesterone—it was mifepristone that caused the massive hemorrhaging, not the attempt to stop its effects. Mitchell D. Creinin, et al., *Mifepristone Antagonization With Progesterone to Prevent Medical Abortion: A Randomized Controlled Trial*, 135 OBSTETRICS & GYNECOLOGY 1, 158-165 (2020), https://perma.cc/U7TU-6BPG.

[92] *Id.*

272.    On her official X social media profile, @NewYorkStateAG, the Attorney General has asserted that "[m]ifepristone is safe and effective" over 20 times in 2023 and 2024 alone, calling upon the federal government to lift existing restrictions and make the abortion drug available at local retail pharmacies.

273.    Under her campaign X profile, @TishJames, the Attorney General has similarly made numerous unequivocal assertions about the safety and efficacy of mifepristone since 2023 such as:

    a.    Mar. 1, 2024: "[M]edication abortion is safe and effective, and it should be accessible in every pharmacy for anyone that needs abortion services" (above a photo of boxes of mifepristone tablets).

    b.    Feb. 24, 2023: "Medication abortion is safe and effective" (retweeting @DemocraticAGs post on the same date which says, "Medication abortion is safe, effective, and must be accessible.").

    c.    Feb. 10, 2023: "Medication abortion is safe, effective....."

274.    The Attorney General begins her Complaint against other pregnancy centers by declaring, "Medication abortion ... is safe and effective[.]"

275.    The Attorney General's public statements about the safety and efficacy of mifepristone omit the black box and other warnings provided on its current FDA label and associated documents.[93]

276.    The FDA, for example, acknowledges that serious adverse events can include serious and even fatal infections and bleeding, as well as sepsis and uterine rupture.

277.    Mifepristone's current label notes that between 2.9–4.6% of women who take mifepristone end up in the emergency room and that 2–7% need surgery to stop bleeding or complete an abortion.

---

[93] *See, e.g., supra* note 23.

278.    In April 2023, the Attorney General led a multistate amicus brief unequivocally extolling the safety of mifepristone,[94] and again asserted in an official press release that mifepristone is safe, while omitting the FDA's black box warning and other ample evidence of serious risks to women's health.[95]

279.    Meanwhile, "safe and effective" is the exact language the Attorney General claims is false about treatment with progesterone, a natural sex hormone that has been safely administered to pregnant women for over 50 years.

280.    Nevertheless, speaking at a rally outside the Supreme Court in March 2024, the Attorney General ironically decried "political decisions" that "ignore the facts, ignore the science, ignore the judgment of medical professionals."[96]

281.    Planned Parenthood Federation of America, an organization with a national office in New York City, publishes false and misleading statements about chemical abortions and progesterone treatment.

282.    For example, on its webpage entitled "How safe is the abortion pill?" Planned Parenthood alleges that "Medication abortion is very safe. In fact, it's safer than many other medicines like penicillin, Tylenol, and Viagra."[97]

---

[94] Brief for the States of New York, et al. as Amici Curiae in Support of Applications for A Stay Pending Appeal to the United States Court of Appeals for the Fifth Circuit and Pending Further Proceedings in This Court, 2023 WL 3122098, *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 222 (5th Cir.), *cert. granted sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*, 144 S. Ct. 537 (2023), and *cert. granted sub nom. Danco Labs., L.L.C. v. All. for Hippocratic Med.*, 144 S. Ct. 537 (2023), and *cert. denied sub nom. All. for Hippocratic Med. v. Food & Drug Admin.*, 144 S. Ct. 537 (2023).

[95] Press Release, Office of the New York State Attorney General, Attorney General James Leads Multistate Coalition to Fight Back Against Decision to Block Medication Abortion Access (Apr. 10, 2023), https://perma.cc/APA7-9BBS.

[96] Andrew Stanton, *Letitia James Goes to the Supreme Court*, NEWSWEEK, (Mar. 30, 2024), https://perma.cc/5ETH-6VYQ.

[97] *How safe is the abortion pill?*, PLANNED PARENTHOOD, https://perma.cc/PWW2-Q4AY.

283.   This statement is false and misleading; Tylenol—which is bought over the counter and has no black box warning—is far safer than mifepristone.

284.   Planned Parenthood and its affiliates also describe chemical abortion as "really safe and effective."[98]

285.   Planned Parenthood does not mention that mifepristone's label contains a black box warning for serious or fatal infections or bleeding.

286.   Planned Parenthood does not mention that, in studies cited on mifepristone's label, between 2.9% and 4.6% of participating women ended up in an emergency room after using the drug.

287.   Planned Parenthood does not mention that mifepristone is available only through an FDA-directed safety program for drugs with serious safety concerns (known as REMS).

288.   Further, Planned Parenthood published a blog post alleging that "Abortion 'Reversal' is Dangerous."[99]

289.   The post specifically states that progesterone treatment is "dangerous," while simultaneously and falsely alleging that there is "no data on the safety" of progesterone treatment.

290.   Planned Parenthood is similarly situated to Heartbeat International and NIFLA, as all provide resources and support to their affiliates to further their respective missions.

---

[98] *Id.*; *Abortion Care at Planned Parenthood of Greater New York*, PLANNED PARENTHOOD OF GREATER NEW YORK, https://perma.cc/GS2Y-RWS4.

[99] Florida Community Content Network, *The Myth of Abortion "Reversal,"* FLORIDA ALLIANCE OF PLANNED PARENTHOOD AFFILIATES, INC., (Aug. 30, 2021), https://perma.cc/WAN5-FXNU.

291.    Planned Parenthood affiliates like Planned Parenthood of Greater New York are similarly situated to the Plaintiff centers and the pro-life pregnancy centers the Attorney General has sued.

292.    Planned Parenthood affiliates and pro-life pregnancy centers both serve women seeking pregnancy-related services.

293.    Planned Parenthood affiliates and pro-life pregnancy centers provide or refer for many of the same services, including pregnancy testing and options counseling, STI testing, medical examinations, and adoption.

294.    A primary difference between Planned Parenthood affiliates and pro-life pregnancy centers is that Planned Parenthood affiliates provide abortions, but pregnancy centers do not provide abortion counseling or referrals.

295.    Another primary difference is that Planned Parenthood and its affiliates are secular organizations but Heartbeat, NIFLA, and their members are faith-based organizations.

296.    The statements of Heartbeat, NIFLA, and their members about progesterone treatment for APR are rooted in their sincere religious beliefs.

297.    The Attorney General knows the religious nature of pro-life pregnancy centers' activities.

298.    The Attorney General knows that many pregnancy centers are affiliated with religious organizations that oppose abortion.[100]

299.    The Attorney General knows that pregnancy centers offer "religious-based programming."[101]

300.    Planned Parenthood charges its patients for chemical abortions.

301.    On information and belief, the Attorney General has not investigated Planned Parenthood or Planned Parenthood of Greater New York for these false

---

[100] *See supra* note 75.
[101] *See supra* note 89.

and misleading statements. Nor has she instigated any action against them for these false and misleading statements.

302.    All of the Attorney General's actions described above that occurred while she has been New York's attorney general were taken under color of the laws of the State of New York.

303.    The Attorney General's actions have chilled the religious speech and exercise of the parties she has sued and Plaintiffs here.

304.    The Attorney General's application of the Business Fraud Statutes as described herein violates the First and Fourteenth Amendments and causes irreparable harm to Plaintiffs.

305.    The Attorney General's enforcement of the Business Fraud Statutes against speech about progesterone treatment violates the First and Fourteenth Amendments and causes irreparable harm to Plaintiffs, including chilling of their protected speech.

306.    Plaintiffs have expended resources to comply with the Attorney General's enforcement of the Business Fraud Statutes against speech about progesterone treatment, and they have suffered economic harm in order to comply with that unlawful censorship of speech.

307.    Plaintiffs have no adequate or speedy remedy at law to correct the Attorney General's deprivation of their rights.

308.    The Attorney General's actions and policies set forth above do not serve any rational, legitimate, or compelling state interest and are not narrowly tailored to serve any such interests.

309.    Because of the Attorney General's actions, Plaintiffs have suffered, and continue to suffer irreparable harm, and are entitled to equitable relief, including a preliminary injunction.

310.    Plaintiffs are entitled to nominal damages and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### FIRST CAUSE OF ACTION

**<u>Violation of Plaintiffs' First Amendment Right to Freedom of Speech:
Content-Based Discrimination, Viewpoint-Based Discrimination,
Unbridled Discretion, and Overbreadth</u>**

311.    Plaintiffs repeat and reallege each allegation in paragraphs 1-310 of this complaint.

312.    Plaintiffs engage in speech to further their mission to provide for those facing unplanned pregnancies, to save the lives of unborn children from abortion, and to ensure women are fully informed and empowered to choose life.

313.    NIFLA and its members associate for the purpose of furthering their expressive missions.

314.    Motivated by their mission and their religious faith, Plaintiffs wish to engage in speech and advertising about progesterone treatment.

315.    This speech is protected by the First Amendment.

316.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment has caused Plaintiffs to take down the statements about APR on their public sites and to refrain from making statements about APR despite a firm belief in their truth and accuracy and despite a desire to do so.

317.    If not for the Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment, Plaintiffs would immediately re-publish their statements about progesterone treatment.

318.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment—

including the exact statements that Plaintiffs want to make—chills, deters, and restricts Plaintiffs' speech.

### *Unlawful Content- and Viewpoint-Based Discrimination*

319.   The First Amendment to the U.S. Constitution protects Plaintiffs' right to speak and be free from content-based discrimination.

320.   Laws that target speech based on its communicative content are presumptively unconstitutional.

321.   The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment is content based because she punishes speech about topics that she dislikes and thus labels misleading, while leaving unregulated speech about topics that she supports.

322.   Government action that seeks to punish Plaintiffs' truthful statements about progesterone treatment violates the First Amendment.

323.   As religious nonprofit entities, Plaintiffs' speech about progesterone treatment in connection with the free services they provide is not commercial speech.

324.   Even if Plaintiffs' speech about progesterone treatment qualifies as commercial speech, it is still constitutionally protected.

325.   The Attorney General's actions against pro-life pregnancy centers cannot survive strict scrutiny or intermediate scrutiny.

326.   While certain traditional areas of content discrimination in the law, such as fraud claims, do not offend the First Amendment, the Attorney General's attempt to enforce these laws against pro-life pregnancy centers lacks several of the guardrails for traditional fraud claims that allow them to comport with the First Amendment.

327.   The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing of fraud-based injury.

328.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without pleading facts showing any consumer relationship.

329.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing of connection to a profit-seeking enterprise.

330.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing that that pregnancy centers obtained money or property through deception.

331.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing of knowledge of falsity or intent to deceive.

332.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing of materiality to any specific recipient of the allegedly false statements.

333.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing of reliance on any allegedly false statement by any specific recipient.

334.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without any showing of actual deception.

335.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without clear and convincing proof.

336.    The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers without pleading fraud with particularity.

337.    Because the Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers lacks any of these critical guardrails for

fraud claims, she claims the power to punish speech on any topic that she thinks is misleading, even speech by non-commercial, nonprofit speakers.

338.   This is unlawful content-based discrimination that violates the First Amendment.

***Unlawful Viewpoint-Based Selective Enforcement***

339.   The Attorney General enforces the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment in a viewpoint discriminatory manner.

340.   The Attorney General will not prosecute or threaten to prosecute under the Business Fraud Statutes statements opining that progesterone treatment *is not* safe and effective, but she is prosecuting statements opining that progesterone treatment *is* safe and effective.

341.   The Attorney General's public statements expressing her personal support for abortion and her opposition to pro-life pregnancy centers show that she is proceeding against pro-life pregnancy centers because of their expressed viewpoint concerning progesterone treatment and because of her animus against pro-life pregnancy centers and this particular viewpoint.

342.   Plaintiffs' statements about progesterone treatment are not commercial speech.

343.   Even if Plaintiffs' statements about progesterone treatment were commercial speech, it is still constitutionally protected.

344.   To avoid prosecution and punishment, pro-life pregnancy centers like Plaintiffs must refrain, and are refraining, from communicating that progesterone treatment is safe and effective, while others may communicate that it is not.

345.   This singling out, punishing, suppressing, and deterring certain speech solely based on its viewpoint about the safety and efficacy of progesterone treatment is unlawful viewpoint-based discrimination.

346.   If Plaintiffs continue to make their desired statements about progesterone treatment, they will face prosecution and other penalties for violation of the Business Fraud Statutes.

347.   This threat chills Plaintiffs' constitutionally protected speech.

***Unbridled Discretion***

348.   The First Amendment's Free Speech Clause prohibits the government from regulating expression based on standards that give officials unbridled discretion to arbitrarily allow some expression and prohibit other expression.

349.   In her application of the Business Fraud Statutes, the Attorney General has demonstrated her unbridled discretion to arbitrarily allow some viewpoints while restricting others.

350.   The Business Fraud Statutes lack objective standards for enforcement, empowering the Attorney General to target and suppress any speech that expresses a viewpoint with which she disagrees: that progesterone treatment is safe and effective.

351.   The Statutes allow the Attorney General to exercise arbitrary enforcement power to suppress views with which she disagrees and labels misleading.

352.   The Statutes necessarily require the Attorney General to assess facts and exercise judgment; this invites decisions based on the content of the speech and the viewpoint of the speaker and raises a danger of censorship.

353.   For example, New York Executive Law § 63(12) does not limit the Attorney General's discretion to determine what speech constitutes "fraud."

354.   Section 349 does not define what types of "acts or practices" are "deceptive" or what constitutes "deception."

355.   Section 350 requires the Attorney General to consider, "among other things," any "representations" made in an advertisement and any "fail[ures] to

reveal facts" about a "commodity" that are "material in light of such representations" under the conditions that are "customary or usual" or "prescribed" in the advertisement.

356.    The Attorney General has utilized this unbridled discretion to censor constitutionally protected speech.

357.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment has caused Plaintiffs harm by censoring their speech, burdening the exercise of their religion, and hindering their missions.

358.    With so few restraints on the Attorney General's authority, New York's General Business Law grants her extraordinary power and unbridled discretion to suppress disfavored messages and is unconstitutional as applied to Plaintiffs' statements about progesterone treatment.

***Overbroad Prior Restraint on Speech***

359.    The First Amendment prohibits governments from imposing overbroad prior restraints on speech.

360.    Plaintiffs' speech about the safety and efficacy of progesterone treatment is non-commercial.

361.    Plaintiffs Gianna's House and Options Care Center and NIFLA's New York members do not charge for their services, including administering progesterone treatment and making progesterone treatment referrals.

362.    The purpose of Plaintiffs' statements about progesterone treatment is to educate women about the availability of progesterone treatment and the potential that they may be able to still save their unborn child even after taking mifepristone.

363.    Plaintiffs' speech about progesterone treatment is not false or misleading.

364.    But the Attorney General's has invoked the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment to penalize, punish, and chill truthful, non-commercial speech.

365.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment is overbroad because it reaches a substantial amount of impermissible applications in relation to the Statutes' plainly legitimate sweep.

366.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment chills a person of ordinary firmness from continuing to engage in a constitutionally protected activity and has indeed caused Plaintiffs to self-censor their speech about progesterone treatment.

### Constitutional Scrutiny

367.    Content-based and viewpoint-based restrictions on speech must survive strict scrutiny.

368.    The Attorney General's application of the Business Fraud Statutes to pro-life pregnancy centers' speech about progesterone treatment cannot survive even intermediate scrutiny.

369.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment—and the corresponding censorship of Plaintiffs' speech about progesterone treatment—does not serve any legitimate, rational, substantial, or compelling interest.

370.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment—and the corresponding censorship of Plaintiffs' speech about progesterone treatment—does not serve any legitimate interest in a narrowly tailored way.

371.   The Attorney General has alternative, less restrictive means to achieve any legitimate interests she might seek to advance.

372.   As the Attorney General's personal and official statements and actions attest, she is acting with a motive to suppress Plaintiffs' constitutionally protected speech and views.

373.   The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment burdens substantially more speech than necessary to further any interest in protecting consumers from deception by commercial speakers.

374.   The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' statements about progesterone treatment has caused Plaintiffs harm by censoring their speech, burdening the exercise of their religion, and hindering their missions.

375.   Accordingly, as applied to Plaintiffs' statements about progesterone treatment, the Business Fraud Statutes violate Plaintiffs' right to speak as protected by the First and Fourteenth Amendments of the United States Constitution.

## SECOND CAUSE OF ACTION

## Violation of Plaintiffs' First Amendment Right to Free Exercise

376.   Plaintiffs repeat and reallege each allegation in paragraphs 1-375 of this complaint.

377.   Plaintiffs' pro-life statements and beliefs in support of progesterone treatment are sincere and rooted in their Christian faith.

378.   Plaintiffs sincerely believe that human life begins at conception.

379.   Plaintiffs sincerely believe that it is their religious duty to inform women and pregnancy centers of options that may save an unborn human life, including about the option of using supplemental progesterone for APR.

380.   The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment forces Plaintiffs to an untenable choice: (1) adhere to their religious beliefs, publish their religiously motivated and required statements about progesterone treatment, and be penalized; or (2) violate their religious beliefs and refrain from publishing their religiously motivated and required statements.

381.   The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment burdens Plaintiffs' right to free exercise of religion by preventing them from expressing these religiously motived and required messages.

382.   Unless government action is neutral and generally applicable, the Free Exercise Clause forbids government action that burdens religion—whether masked or overt—without satisfying strict scrutiny.

383.   The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment is not neutral to religion or generally applicable for several reasons and fails strict scrutiny.

384.   The Attorney General has shown direct targeting and hostility toward the Plaintiffs' faith-based, pro-life mission and their speech in support of that mission through both her public statements about them and her enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment under a consumer protection theory divorced from any consumer relationship.

385.    The Attorney General interprets and applies the Business Fraud Statutes to create a system of individualized assessments that empowers her to censor religiously motivated and required speech she dislikes while allowing secular speech that she favors.

386.    The Attorney General has crafted an enforcement theory against religious speech by a group of organizations that are exclusively faith-based organizations.

387.    Her hostility to religious organizations that provide free services to vulnerable women is irrational.

388.    The Attorney General's interpretation of the Business Fraud Statutes as allowing her to sue against speech she deems false without showing other elements of fraud amounts to a system of individualized assessments.

389.    The Attorney General's enforcement of the Business Fraud Statutes against pregnancy centers while leaving similarly situated entities like Planned Parenthood untouched is not neutral.

390.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment is thus not neutral.

391.    The Attorney General lacks a legitimate or compelling state interest to justify targeting pro-life pregnancy centers for their statements about progesterone treatment.

392.    The Attorney General demonstrates that she lacks a compelling state interest because she has not censored misleading public statements about chemical abortion and progesterone treatment by Planned Parenthood.

393.    Conversely, the Attorney General's actions and threat of civil sanctions place a substantial burden and pressure on Plaintiffs to remove their religiously motivated and required statements about APR.

394.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment has caused Plaintiffs harm by burdening the exercise of their religion and hindering their religiously motivated missions and religiously required speech.

395.    Absent the Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment, Plaintiffs would immediately speak and publish their religiously motivated and required messages about progesterone treatment.

396.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment is not justified by any legitimate, rational substantial, or compelling interest.

397.    The Attorney General has alternative, less restrictive means to achieve any legitimate interests she might seek to advance.

398.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment also violates Plaintiffs' free exercise rights under the hybrid rights doctrine because it implicates free exercise rights in conjunction with other constitutional protections like the right to free speech.

399.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment violates the Free Exercise Clause of the First Amendment.

## THIRD CAUSE OF ACTION

## Violation of Plaintiffs' Fourteenth Amendment Right to Due Process: Vagueness

400.    Plaintiffs repeat and reallege each allegation in paragraphs 1–397 of this complaint.

401.    The Fourteenth Amendment to the U.S. Constitution prohibits the government from forbidding or requiring an act in terms so vague that people must guess at their meaning and can differ as to their application.

402.    Laws that punish or otherwise interfere with free speech require greater definiteness than other contexts.

403.    The government may not regulate speech based on policies that permit arbitrary, discriminatory, and overzealous enforcement.

404.    The government may not regulate speech based on policies that do not provide persons of common intelligence with fair warning as to what speech is permitted and what speech is prohibited.

405.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment, which regulate truthful speech by religious nonprofits that provide all their services for free, violates the constitutional vagueness standards.

406.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment impermissibly delegates to her basic policy matters for resolution on an ad hoc and explicitly subjective basis in a manner that causes arbitrary and discriminatory application against faith-based, pro-life pregnancy centers' protected speech and religious exercise.

407.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment fails to give persons of ordinary intelligence fair notice of what constitutes "deceptive acts or practices" or "the furnishing of any service" under Section 349(a).

408.    Section 349(b) leaves it entirely to the discretion of the enforcer what constitutes a "deceptive act or practice," granting her enforcement authority whenever she "believe[s] *from evidence satisfactory to [her]* that any person,

firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful" in subsection (a). The Statute fails to place any limitation on what evidence the attorney general may consider "satisfactory."

409.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment fails to give persons of ordinary intelligence fair notice of what constitutes "false advertising" or "the furnishing of any service" under Section 350.

410.    Section 350 defines "false advertising" as any advertising, including labeling, of a commodity or employment "if such advertising is misleading in a material respect," but leaves entirely to the discretion of the enforcer what constitutes a material misrepresentation.

411.    Section 350-a confines prohibited advertising to that of a "commodity" or "employment," but does not define either.

412.    As generally understood, a "commodity" does not include limited services like progesterone treatment.

413.    Section 350-a fails to define what conditions are "customary or usual" for purposes of determining whether an advertisement for a commodity or employment is misleading.

414.    Construing these statutory terms to apply to Plaintiffs' speech about progesterone treatment violates the vagueness doctrine.

415.    New York courts have construed sections 349 and 350 to apply to commercial endeavors, not to general expressions of opinion about public matters.

416.    Plaintiffs' statements about progesterone treatment fall squarely into the latter category, yet the Attorney General has used the vague language of the statutes to prosecute pregnancy centers for the same expression Plaintiffs want to convey.

417.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment also fails to give persons of ordinary intelligence fair notice of what constitutes "fraud" under New York Executive Law § 63(12) and allows arbitrary and discriminatory application by authorizing the Attorney General to "make a determination of the relevant facts" when pursuing an investigation and enforcement proceeding.

418.    New York Executive Law § 63(12) defines "fraud" and "fraudulent" circularly, by saying that they include "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

419.    New York Executive Law § 63(12) fails to define these equally ambiguous terms, allowing the Attorney General to resolve on an ad hoc and subjective basis what constitutes fraudulent conduct under the statute.

420.    New York Executive Law § 63(12) also fails to meaningfully restrain what proof and relevant facts are sufficient to pursue an investigation and enforcement proceedings.

421.    The Business Fraud Statutes are so imprecise that discriminatory enforcement is not only a possibility but also a reality.

422.    This is demonstrated by the fact that numerous scientific studies support the statements about progesterone therapy that Plaintiffs have made and want to make, yet the Attorney General deems these studies not to be sufficiently reliable.

423.    No reasonable person can guess at what the Attorney General will deem reliable enough evidence to permit their speech.

424.    Plaintiffs have censored their constitutionally protected speech in order to avoid prosecution by the Attorney General.

425.    The Attorney General's enforcement of the Business Fraud Statutes against pro-life pregnancy centers' speech about progesterone treatment is not justified by any legitimate, rational substantial, or compelling interest.

426.    The Attorney General has alternative, less restrictive means to achieve any legitimate interests she might seek to advance.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiffs respectfully pray for judgment against Defendant and request the following relief:

A.    A preliminary and permanent injunction barring the Attorney General, her agents, officials, servants, employees, and any other persons acting on her behalf from enforcing New York General Business Law, Article 22-A, §§ 349 and 350 and Executive Law § 63(12) against Plaintiffs and their members for speaking about the use of progesterone for abortion pill reversal;

B.    A declaration that New York General Business Law §§ 349 and 350 and Executive Law § 63(12) are unconstitutional under the First and Fourteenth Amendments as applied to restrict Plaintiffs and their members' speech about progesterone for abortion pill reversal;

C.    Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

D.    All other further relief to which Plaintiffs may be entitled.

Respectfully submitted this 24th day of May, 2024.

J. Caleb Dalton*                          */s/ Michael G. McCartin*
Gabriella M. McIntyre*                    Michael G. McCartin
Allison H. Pope*                          Michael G. McCartin Law PLLC
Alliance Defending Freedom                38 Mall Way #513
44180 Riverside Pkwy                      West Sand Lake, New York 12196-9998
Lansdowne, VA 20176                       WDNY Bar Roll No. 2447712
Tel: (571) 707-4655                       Tel: (518) 953-3333
cdalton@adflegal.org                      mccartinlaw@gmail.com
apope@adflegal.org
gmcintyre@adflegal.org                    Erin M. Hawley*
                                          Lincoln Davis Wilson**
                                          Timothy A. Garrison*
                                          Alliance Defending Freedom
                                          440 First Street NW, Suite 600
                                          Washington, DC 20001
                                          Tel: (202) 393-8690
                                          ehawley@adflegal.org
                                          lwilson@adflegal.org
                                          tgarrison@adflegal.org

                        *Counsel for Plaintiffs*

*Pro hac vice to be filed

**Application for admission to be filed

## VERIFICATION OF COMPLAINT

I, Thomas A. Glessner, a citizen of the United States and a resident of _McGaheysville_, Virginia, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegations therein, and further declare that all facts, with the exclusion of those facts specific to Plaintiffs Gianna's House and Options Care Center, are true and correct.

Executed this _24th_ day of May, 2024, at _Fredericksburg_ Virginia.

Thomas A. Glessner, J.D.
Founder and President
National Institute of Family
and Life Advocates

## VERIFICATION OF COMPLAINT

I, Juliann Noce, a citizen of the United States and a resident of _Brewster_, New York, declare under penalty of perjury under 28 U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual allegation therein, and the facts as alleged as to Plaintiff Gianna's House are true and correct.

Executed this _24_ day of May, 2024, at _Brewster_, New York.

_Juliann Noce_
Juliann Noce
Executive Director
Gianna's House, Inc.

## VERIFICATION OF COMPLAINT

I, Jessie Andersen, a citizen of the United States and a resident of
*Sinclairville*, New York, declare under penalty of perjury under 28
U.S.C. § 1746 that I have read the foregoing Verified Complaint and the factual
allegation therein, and the facts as alleged as to Plaintiff Options Care Center are true
and correct.

Executed this *23* day of May, 2024, at *Sinclairville*, New York.

Jessie Andersen
Executive Director
Choose Life of Jamestown, Inc.,
d/b/a Options Care Center

66