## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES, GIANNA'S HOUSE, INC., and CHOOSE LIFE OF JAMESTOWN, INC. d/b/a OPTIONS CARE CENTER,<br><br>　　　　　　*Plaintiffs*,<br><br>　　v.<br><br>LETITIA JAMES, in her official capacity as Attorney General of New York,<br><br>　　　　　　*Defendant*. | Case No.: 1:24-cv-00514 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ...................................................................................... ii

Introduction ................................................................................................. 1

Factual Background ..................................................................................... 2

    A.    Scientific research supports using progesterone for APR. ................... 3

    B.    The Attorney General invokes New York's Business Fraud Statutes against pregnancy centers speaking about APR. .................... 6

    C.    Plaintiffs sue to stop the threat they face from an unconstitutional enforcement action. .................................................................... 7

Argument ..................................................................................................... 8

I.    Plaintiffs are likely to succeed on their First Amendment claims. ................. 8

    A.    Applying the Business Fraud Statutes against pregnancy centers' speech about APR is unlawful content and viewpoint discrimination. ........................................................................ 8

        1.    The First Amendment entitles Plaintiffs to speak truthfully about off-label uses of prescription medicines. ............................ 9

        2.    The Attorney General is trying to censor speech she dislikes without traditional showings of knowledge, reliance, loss, or materiality to a victim or consumers. ......................... 11

        3.    The Attorney General's actions fail heightened scrutiny. ......... 14

    B.    The Attorney General's selective enforcement against pregnancy centers is unlawful. ................................................................ 18

    C.    The Attorney General's enforcement of the Business Fraud Statutes against pregnancy centers violates religious freedom. .......... 21

II.    The other preliminary-injunction factors favor Plaintiffs. ............................ 24

Conclusion .................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. American Civil Liberties Union,*
    535 U.S. 564 (2002) ................................................................................................. 8

*Ashcroft v. American Civil Liberties Union,*
    542 U.S. 656 (2004) ................................................................................................. 9

*Bella Health & Wellness v. Weiser,*
    No. 1:23-cv-00939, 2023 WL 6996860 (D. Colo. Oct. 21, 2023).......................... 10

*Bery v. City of New York,*
    97 F.3d 689 (2d Cir. 1996)..................................................................................... 24

*Bigelow v. Virginia,*
    421 U.S. 809 (1975) ............................................................................................... 25

*Boy Scouts of America v. Wyman,*
    335 F.3d 80 (2d Cir. 2003)..................................................................................... 18

*Buckman Company v. Plaintiffs' Legal Committee,*
    531 U.S. 341 (2001) ................................................................................................. 9

*Central Hudson Gas & Electric Corporation v. Public Service Commission of New York,*
    447 U.S. 557 (1980) ............................................................................................... 25

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................................. 21, 22, 23

*City of Austin v. Reagan National Advertising of Austin, LLC,*
    596 U.S. 61 (2022) ................................................................................................... 8

*Donaldson v. Read Magazine,*
    333 U.S. 178 (1948) ............................................................................................... 11

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................................... 24

*Fink v. Time Warner Cable,*
    714 F.3d 739 (2d Cir. 2013)................................................................................... 12

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ............................................................................................... 21

*Frederick Douglass Foundation, Inc. v. District of Columbia,*
    82 F.4th 1122 (D.C. Cir. 2023).............................................................................. 18

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ............................................................................................... 24

*Goshen v. Mutual Life Insurance Company of New York,*
   98 N.Y.2d 314 (2002) ................................................................................................. 11

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,*
   538 U.S. 600 (2003) ............................................................................ 12, 13, 16

*Kennedy v. Bremerton School District,*
   597 U.S. 507 (2022) ................................................................................................. 21

*M.A. on behalf of H.R. v. Rockland County Department of Health,*
   53 F.4th 29 (2d Cir. 2022) ........................................................................ 21, 22

*MacNoughton v. Young Living Essential Oils, LC,*
   67 F.4th 89 (2d Cir. 2023) .......................................................................................... 6

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   584 U.S. 617 (2018) ............................................................................ 21, 22, 24

*National Institute of Family & Life Advocates v. Becerra,*
   585 U.S. 755 (2018) ...................................................................... 8, 14, 15, 17

*New York Public Interest Research Group v. Insurance Information Institute,*
   161 A.D.2d 204 (N.Y. App. Div. 1990) ................................................................ 11

*New York Times Company v. Sullivan,*
   376 U.S. 254 (1964) ................................................................................................. 17

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,*
   85 N.Y.2d 20 (1995) ................................................................................................... 6

*Porzecanski v. Azar,*
   943 F.3d 472 (D.C. Cir. 2019) ............................................................................... 10

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................................................... 8

*Resource Group International Limited v. Chishti,*
   91 F.4th 107 (2d Cir. 2024) ...................................................................................... 8

*Riley v. National Federation of the Blind of North Carolina, Inc.,*
   487 U.S. 781 (1988) ................................................................................................. 15

*Rosenberger v. Rector & Visitors of University of Virginia,*
   515 U.S. 819 (1995) ................................................................................. 8, 18, 21

*Schlaifer Nance & Company v. Estate of Warhol,*
   119 F.3d 91 (2d Cir. 1997) ............................................................................ 12, 16

*Small v. Lorillard Tobacco Company,*
   252 A.D.2d 1 (App. Div. 1998), *aff'd*, 94 N.Y.2d 43 (1999) .................................. 12

*Sorrell v. IMS Health, Inc.,*
   564 U.S. 552 (2011) ................................................................................................... 8

iii

*Tandon v. Newsom,*
   593 U.S. 61 (2021) ................................................................................ 24

*Thompson v. Western States Medical Center,*
   535 U.S. 357 (2002) .............................................................................. 16

*Transportation Alternatives, Inc. v. New York,*
   340 F.3d 72 (2d Cir. 2003) .................................................................... 15

*United States v. Alvarez,*
   567 U.S. 709 (2012) ......................................................... 11, 13, 14, 17

*United States v. Caronia,*
   703 F.3d 149 (2d Cir. 2012) .......................................................... passim

*United States v. Johnson,*
   945 F.3d 606 (2d Cir. 2019) .................................................................. 12

*United States v. United Foods, Inc.,*
   533 U.S. 405 (2001) .............................................................................. 14

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) .............................................................................. 25

*Wandering Dago, Inc. v. Destito,*
   879 F.3d 20 (2d Cir. 2018) .................................................................... 18

*Wayte v. United States,*
   470 U.S. 598 (1985) .............................................................................. 18

## Statutes

N.Y. Educ. Law § 6530 (McKinney 2021) .................................................... 16

N.Y. Exec. Law § 63 (McKinney 2022)................................ 1, 7, 11, 14

N.Y. Gen. Bus. Law Art. 22-A, § 349 (McKinney 2014) ..................... 1, 6, 11

N.Y. Gen. Bus. Law Art. 22-A, § 350 (McKinney 1963) ..................... 1, 6, 11

N.Y. Pub. Health Law § 230 (McKinney 2023).......................................... 16

## Other Authorities

Abortion Pill Reversal / Abortion Pill Rescue Network, *Abortion Pill Reversal,*
   abortionpillreversal.com............................................................... 19

Attorney General Letitia James, *How New York protects your right to
   reproductive health care,* N.Y STATE ATTORNEY GENERAL,
   https://perma.cc/KFU6-MYAS ............................................................. 7

iv

Attorney General Rob Bonta, *Open Letter from Attorneys General Regarding CPC Misinformation and Harm*, STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL 8 (Oct. 23, 2023), https://perma.cc/4SA5-9FXD .............. 7, 23

Christina Camilleri & Stephen Sammut, *Progesterone-mediated reversal of mifepristone-induced pregnancy termination a rat model: an exploratory investigation*, 13 SCIENTIFIC REPORTS 10942 (2023), https://perma.cc/4SAL-DDP3.................................................................................................................... 4, 10

*Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE) (updated Nov. 24, 2021), https://perma.cc/Y9TE-KCY5 ......................................... 5

*Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE), 16 (November 2021), https://perma.cc/4W4X-Q95Y................................................ 5, 10

EMILY OSTER, EXPECTING BETTER, 169 (Penguin Books, 1st Ed. 2014)...................... 5

Food and Drug Administration, *Mifeprex (mifepristone) Label,* (Jan. 2023), https://perma.cc/4895-X457................................................................... 19

Food and Drug Administration, *Prometrium Label*, https://perma.cc/CR46-2FTS .... 5

George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 ISSUES L. & MED. 21, 24-25 (2018), https://perma.cc/ZR33-UJWFe............................................................... 4, 5

Gian Carlo Di Renzo et al., *Progesterone: History, facts, and artifacts*, 69 BEST PRACTICE & RSCH. CLINICAL OBSTETRICS & GYNAECOLOGY 2 (2020) ...................... 4

Jessica C. Leek & Hasan Arif, *Pregnancy Medications*, NIH STATPEARLS (Jul. 24, 2023), https://perma.cc/K52A-GUPQ......................................................... 5

Jillian Jorgensen, *AG candidate Letitia James would seek broad authority to prosecute those who block abortion clinics* (Jul. 26, 2018), NEW YORK DAILY NEWS, https://perma.cc/3QE7-EYQC ................................................................ 22

Letitia James & Andrea Miller, *With Fake Clinics Proliferating, New Yorkers Should Know Their Reproductive Health Care Rights* (Sep. 24, 2018), GOTHAM GAZETTE, https://perma.cc/6AMY-82DQ ................................................. 22

Letter from Lisa Rarick M.D., Food and Drug Admin. to Joseph Lamendola, Ph.D, Schering Corp. (Dec. 16, 1998), https://perma.cc/M7T7-VSDL ..................... 4

Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 INT'L J. MOLECULAR SCIS. 14, July 2022....................................................................................................... 4

Mary L. Davenport et al*., Embryo Survival After Mifepristone: A Systematic Review of the Literature,* 32 ISSUES L. & MED. 1 (2017) .......................................... 4

New York Attorney General James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/H9JC-KNCH .................................................................. 22

New York Attorney General James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/M59B-NJDZ ................................................................... 22

New York Attorney General James (@NewYorkStateAG), X (Jun. 29, 2022, 2:50 PM), https://perma.cc/5FAS-MQ3K ..................................................................... 7

New York Attorney General James, @NewYorkStateAG, https://perma.cc/3XEH-TZQ2 ....................................................................................................................... 20

Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, THE LINACRE QUARTERLY (July 2023), https://perma.cc/AR8M-U474 .................................................................. 5, 10

Planned Parenthood of Greater New York, *Our Services*, https://perma.cc/BG3X-MMHL ...................................................................................................................... 18

Planned Parenthood of Greater New York, *Pregnancy Testing and Planning*, https://perma.cc/5DKF-G28K ....................................................................................... 19

Planned Parenthood of Greater New York, *The Abortion Pill*, https://perma.cc/6GE8-49RF ....................................................................................... 19

Planned Parenthood, *Abortion*, https://perma.cc/MGR6-FA4V ................................. 20

Planned Parenthood, *How much does the abortion pill cost?*, https://perma.cc/XS4J-LHVU ....................................................................................... 20

Planned Parenthood, *How Safe Is the Abortion Pill?*, https://perma.cc/PWW2-Q4AY ...................................................................................................................... 19

Planned Parenthood, *Mission*, https://perma.cc/MT96-N5K3 .................................... 19

Press Release, Office of the New York State Attorney General, Attorney General James Applauds Google for Improving Search Results for Individuals Seeking Abortion Care (Aug. 25, 2022) https://perma.cc/LB65-QD2G............................... 22

Press Release, Office of the New York State Attorney General, Attorney General James Sues Anti-Abortion Group and 11 New York Crisis Pregnancy Centers for Promoting Unproven Abortion Reversal Treatment (May 6, 2024), https://perma.cc/U572-Z6FR .................................................................. 15, 20, 23

*Prometrium Prescribing Information*, Drugs.com, https://perma.cc/RDN3-WNQ8 .... 5

*Reproductive Rights*, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, https://perma.cc/6RCA-Q4NU ....................................................................................... 23

Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. TIMES (July 18, 2017), https://perma.cc/CN75-8YEU ................... 1

Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 FOLIA ENDOCRINOLOGICA JAPONICA 497 (1989), https://perma.cc/FY3C-ADAD .............................................................................. 3, 10

**Rules**

Fed. R. Civ. P. 9 ......................................................................................... 16

## INTRODUCTION

New York's Attorney General, Letitia James, is seeking to punish and silence the speech of religious nonprofits regarding certain uses of progesterone. The nonprofits receive no economic benefit from speaking about progesterone or from referring women to the physicians who prescribe it. The challenged use of progesterone is perfectly legal under state and federal law, and numerous studies have shown it is both safe and effective. Yet the Attorney General has sought to leverage her authority under New York's Business Fraud Statutes[1] to sue and silence nearly a dozen religious nonprofits because she says their speech about this use of progesterone is misleading.

The Attorney General's unprecedented use of these statutes to silence noncommercial speech flows from her animus towards the viewpoint the religious nonprofits express: the use of progesterone to stop the effects of an initiated chemical abortion. The chemical-abortion process begins when a pregnant woman takes mifepristone, a drug that works by blocking progesterone receptors, preventing the development of her unborn child. If a woman changes her mind and decides to continue her pregnancy, administering progesterone within 72 hours can inhibit mifepristone's effects. As Yale's pro-choice Dr. Harvey Kliman has explained, if one of his daughters accidentally took mifepristone during pregnancy, "he would tell her to take 200 milligrams of progesterone three times a day for several days," and "'I bet you it would work.'"[2] Scientific research supports Dr. Kliman's intuition.

The Attorney General, a staunch pro-abortion advocate, discards this science. She says that statements suggesting that progesterone can be used for this purpose—called "abortion pill reversal" or "APR"—are false and misleading. That's

---

[1] N.Y. Exec. Law § 63(12); N.Y. Gen. Bus. Law Art. 22-A, §§ 349, 350.
[2] Ruth Graham, *A New Front in the War Over Reproductive Rights: 'Abortion-Pill Reversal'*, N.Y. TIMES (July 18, 2017), https://perma.cc/CN75-8YEU.

wrong. But she claims that by invoking statutes about business fraud to punish noncommercial speech, she can sanction anyone who speaks truthfully about the lawful use of this medication with penalties, attorney's fees, and other relief up to and including dissolution of their organizations.

That Orwellian theory threatens Plaintiffs here. Plaintiffs are also religious, pro-life nonprofits that have spoken and wish to continue speaking about progesterone for APR, but their speech has been chilled by the Attorney General's enforcement actions. The Court should grant them a preliminary injunction for three reasons. *First*, Plaintiffs have a First Amendment right to speak truthfully, including about off-label uses of prescription medicines, and the Attorney General's attempt to silence speech based solely on her objection to its viewpoint cannot survive constitutional scrutiny. *Second*, the Attorney General's actions are unlawful viewpoint discrimination that selectively enforce the statutes against pro-life pregnancy centers while promoting the misleading speech of pro-abortion clinics. And *third*, the Attorney General's actions violate the Free Exercise Clause through her hostility to the pregnancy centers' pro-life, Christian viewpoint. The Court should therefore enjoin her from enforcing the Business Fraud Statutes against Plaintiffs' speech about progesterone for APR.

## FACTUAL BACKGROUND

Plaintiff National Institute of Family and Life Advocates ("NIFLA") is a Christian, nonprofit association of life-affirming pregnancy centers. Verified Complaint ("Compl.") ¶¶ 22–24. It empowers women and families to choose life for their unborn children by providing legal counsel, education, and training to its member centers. Compl. ¶ 27. Plaintiffs Gianna's House and Options Care Center are two of NIFLA's pro-life, faith-based, nonprofit member centers in New York. *Id.* ¶¶ 45–47, 58–60. NIFLA pregnancy centers provide their life-affirming services to

2

clients for free, as part of their Christian mission to protect unborn life. *Id.* ¶¶ 31–32. New York members provide no-cost referrals to physicians for progesterone treatment and do not receive any remuneration for those referrals. *Id.* ¶¶ 34–35. Plaintiffs all have spoken and wish to continue speaking about progesterone for APR. *Id.* ¶¶ 28, 56, 71, 168–236.

### A.   Scientific research supports using progesterone for APR.

In a typical chemical abortion, a woman takes two drugs. Decl. of Christina Francis, M.D. ¶ 11, attached as Exhibit A. First mifepristone, a progesterone-receptor antagonist, which blocks receptors for progesterone, a hormone that is necessary to maintain pregnancy. *Id.* Second misoprostol, which induces contractions to expel the embryo or fetus and pregnancy tissue. *Id.* ¶ 12. But if a woman changes her mind after taking mifepristone but before taking misoprostol, studies have shown she may take supplemental progesterone to counteract or "reverse" the effects of the mifepristone and deliver a healthy baby. *Id.* ¶ 20. This process is supported by a biochemical principle called "reversible competitive inhibition." *Id.* ¶¶ 16–17.

Multiple scientific studies have shown progesterone can counter the effects of mifepristone. *Id.* ¶¶ 20–31. In 1989, researchers investigated progesterone's role in in pregnancy in rats, known for their physiological similarity to humans.[3] *Id.* ¶¶ 26, 28. The study found that four days after receiving mifepristone, only 33.3% of the rats who were not given progesterone were still pregnant, but 100% of the rats who were given progesterone remained pregnant.[4] *Id.* ¶ 26. A 2023 study found 81% of fetuses survived in rats given progesterone after mifepristone, but none survived in

---

[3] Shingo Yamabe et al., *The Effect of RU486 and Progesterone on Luteal Function During Pregnancy*, 65 Folia Endocrinologica Japonica 497 (1989), https://perma.cc/FY3C-ADAD, Verified Compl. Ex. O, ECF No. 2-3.
[4] *Id.*

rats given mifepristone without progesterone.[5] *Id.* ¶ 27. The authors concluded this was evidence of "a clear progesterone-mediated reversal of an initiated mifepristone-induced termination ... at first-trimester human equivalent."[6]

An observational case series of pregnant women published in 2018 found a similar effectiveness result. Of 547 women who underwent progesterone therapy within 72 hours of taking mifepristone, nearly half maintained their pregnancies through birth.[7] *Id.* ¶ 20. Where progesterone was delivered intramuscularly or orally at a high dose and then taken daily through the first trimester, unborn children survived at rates of 64% and 68%, respectively.[8] *Id.* By comparison, if mifepristone alone is taken, they survive only about 25% of the time.[9] *Id.* ¶ 22.

Using progesterone for APR is also safe. *Id.* ¶¶ 32–38. The FDA approved progesterone as a prescription medication in 1998[10] and doctors have legally prescribed it off label for various uses for decades, including to prevent miscarriages and preterm births.[11] "Natural progesterone has been safely used during pregnancy

---

[5] Christina Camilleri & Stephen Sammut, *Progesterone-mediated reversal of mifepristone-induced pregnancy termination a rat model: an exploratory investigation*, 13 SCIENTIFIC REPORTS 10942 (2023), https://perma.cc/4SAL-DDP3, Verified Compl. Ex. R, ECF No. 2-6.

[6] *Id.*

[7] George Delgado et al., *A Case Series Detailing the Successful Reversal of the Effects of Mifepristone Using Progesterone*, 33 ISSUES L. & MED. 21, 24-25 (2018), https://perma.cc/ZR33-UJWF*e*, Verified Compl. Ex. P, ECF No. 2-4.

[8] *Id.* at 26.

[9] *Id.*; *see also* Mary L. Davenport et al*., Embryo Survival After Mifepristone: A Systematic Review of the Literature,* 32 ISSUES L. & MED. 1 (2017), Verified Compl. Ex. M, ECF No. 2-1.

[10] Letter from Lisa Rarick M.D., Food and Drug Admin. to Joseph Lamendola, Ph.D, Schering Corp. (Dec. 16, 1998), https://perma.cc/M7T7-VSDL.

[11] *See* Gian Carlo Di Renzo et al., *Progesterone: History, facts, and artifacts*, 69 BEST PRACTICE & RSCH. CLINICAL OBSTETRICS & GYNAECOLOGY 2, 9 (2020), Verified Compl. Ex. G, ECF No. 1-9; Lucie Kolatorova et al., *Progesterone: A Steroid with Wide Range of Effects in Physiology as Well as Human Medicine*, 23 INT'L J. MOLECULAR SCIS. 14, July 2022, Verified Compl. Ex. C, ECF No. 1-5.

for over 50 years, notably to support IVF pregnancies and in women who have a history of pregnancy loss." *Id.* ¶ 34. Indeed, the FDA classifies supplemental progesterone as a "Category B" drug for pregnant women—the same category as Tylenol, the most common pain reliever used during pregnancy.[12] Category B drugs have been shown to pose no risk in animal studies, including no risk to the fetus.[13]

The United Kingdom's public health authority recommends progesterone therapy for women with early pregnancy bleeding and a previous miscarriage.[14] *Id.* ¶ 37. In 2021, it specifically noted "there was no evidence of harms for women or babies" from the use of progesterone, including "no increase in risk of ... congenital abnormalities or adverse drug reactions."[15] The 2018 case series also found no increased risk of birth defects after supplemental progesterone, and the rate of preterm delivery was 2.7%, much lower than the 10% average in the United States.[16] *Id.* ¶ 33. And a 2023 review of 16 studies found "no increased maternal or fetal risk from using bioidentical progesterone in early pregnancy."[17]

---

[12] FDA, *Prometrium Label*, at 19, https://perma.cc/CR46-2FTS; *Prometrium Prescribing Information*, Drugs.com, https://perma.cc/RDN3-WNQ8; *see also* EMILY OSTER, EXPECTING BETTER, 169 (Penguin Books, 1st Ed. 2014).

[13] Jessica C. Leek & Hasan Arif, *Pregnancy Medications*, NIH STATPEARLS (Jul. 24, 2023), https://perma.cc/K52A-GUPQ.

[14] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE) (updated Nov. 24, 2021), https://perma.cc/Y9TE-KCY5 (Guideline NG126, Recommendation 1.5.2), Verified Compl. Ex. I, ECF No. 1-11.

[15] *Ectopic pregnancy and miscarriage: diagnosis and initial management*, NATIONAL INSTITUTE FOR HEALTH AND CARE EXCELLENCE (NICE), 16 (November 2021), https://perma.cc/4W4X-Q95Y (Guideline NG126 Update), Verified Compl. Ex. J, ECF No. 1-12.

[16] Delgado at 26, ECF No. 2-4, *supra* note 7.

[17] Paul L.C. DeBeasi, *Mifepristone Antagonization with Progesterone to Avert Medication Abortion: A Scoping Review*, THE LINACRE QUARTERLY (July 2023), https://perma.cc/AR8M-U474, Verified Compl. Ex. S, ECF No. 2-7.

**B.    The Attorney General invokes New York's Business Fraud Statutes against pregnancy centers speaking about APR.**

Last month, the Attorney General served Heartbeat International and 11 of its pro-life pregnancy centers with notices that she intended to sue them for making statements about progesterone for APR. Notice of Intention to Sue (Apr. 22, 2024), Verified Compl. Ex. A, ECF No. 1-3. Like Plaintiffs, none of these centers provide APR themselves, but rather refer women to physicians. Compl. ¶ 34. Yet the Attorney General threatened to sue them under New York's Business Fraud Statutes for "statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol, including, but not limited to, statements and omissions relating to the safety and efficacy of the APR protocol." Notice, ECF No. 1-3. She quickly followed through. Compl., *People v. Heartbeat Int'l, Inc.*, No. 451314/2024 (N.Y. Sup. Ct. May 6, 2024), Verified Compl. Ex. T, ECF No. 2-8 ("James Compl.").

This use of the Business Fraud Statutes against nonprofits' statements about services for which they receive no money goes far beyond the traditional and textual moorings of these laws, which are confined to the commercial context. New York's General Business Law prohibits "[d]eceptive acts or practices" and "[f]alse advertising" "in the conduct of any business, trade, or commerce or in the furnishing of any service" in the state. N.Y. Gen. Bus. Law §§ 349(a), 350. "Deceptive acts or practices" include "representations or omissions" that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25–26 (1995). "False advertising" includes advertising of a "commodity" that is "misleading in a material respect." N.Y. Gen. Bus. Law § 350-a(1). It must be "likely to mislead a reasonable consumer acting reasonably under the circumstances." *MacNoughton v. Young Living Essential Oils, LC,* 67 F.4th 89, 96 (2d Cir. 2023) (citation omitted). Likewise, New York Executive Law § 63(12) allows the attorney general to sue any person who "engage[s] in repeated fraudulent or illegal acts or otherwise

6

demonstrate[s] persistent fraud or illegality in *the carrying on, conducting, or transaction of business*[.]" N.Y. Exec. Law § 63(12) (emphasis added).

This twisting of New York's business laws to punish pregnancy centers is all the more concerning given the Attorney General's long and open history of public animus against them. She describes pregnancy centers, which are almost uniformly Christian organizations, as "[f]ake clinics."[18] Compl. ¶ 79. She pressured Google to discriminate against pregnancy centers because they "exist to discourage people from having an abortion."[19] And she joined an open letter from state attorneys general criticizing pregnancy centers and pledging to use her consumer protection authority to "take numerous actions aiming to mitigate [their] harmful effects."[20]

### C. Plaintiffs sue to stop the threat they face from an unconstitutional enforcement action.

Plaintiffs have made and would like to make statements about APR, some of which are identical to, and others of which are substantially similar to, those targeted by the Attorney General in her lawsuit. Compl. ¶¶ 168–236. But the Attorney General's suit, coupled with her open hostility to pregnancy centers writ large, has caused them to stop making this speech, for fear they will be prosecuted, too. *Id.* ¶¶ 171, 183, 187, 212, 230, 234. To protect their right to resume making that protected speech, Plaintiffs filed this lawsuit, and now move for a preliminary injunction.

---

[18] Attorney General Letitia James, *How New York protects your right to reproductive health care*, N.Y STATE ATTORNEY GENERAL, https://perma.cc/KFU6-MYAS.

[19] NY AG James (@NewYorkStateAG), X (Jun. 29, 2022, 2:50 PM), https://perma.cc/5FAS-MQ3K.

[20] Attorney General Rob Bonta, *Open Letter from Attorneys General Regarding CPC Misinformation and Harm*, STATE OF CALIFORNIA OFFICE OF THE ATTORNEY GENERAL 8 (Oct. 23, 2023), https://perma.cc/4SA5-9FXD.

**ARGUMENT**

"A plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that [the plaintiff] is likely to suffer irreparable injury ...; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved" by the injunction. *Res. Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024) (cleaned up). Plaintiffs meet all of these elements.

**I.   Plaintiffs are likely to succeed on their First Amendment claims.**

**A.   Applying the Business Fraud Statutes against pregnancy centers' speech about APR is unlawful content and viewpoint discrimination.**

The First Amendment "prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). This "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotation omitted). Government action is content-based if it "discriminate[s] based on 'the topic discussed or the idea or message expressed,'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73–74 (2022), and viewpoint-based if it targets "particular views taken by speakers on a subject," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "In the ordinary case, it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 571 (2011). Both are "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Like all fraud statutes, the Business Fraud Statutes are content-based, and the Attorney General's unique enforcement of those statutes against pregnancy centers is also viewpoint-based, since she seeks to punish statements supporting the safety and efficacy "of the Abortion Pill Reversal ('APR') protocol" but not statements criticizing that protocol. Notice, ECF No. 1-3; *see also* James Compl.

8

¶¶ 9–11, ECF No. 2-8. She thus bears "the burden of showing [the] constitutionality" of her actions. *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

Plaintiffs are entitled to make truthful speech about progesterone for APR, and the Attorney General's claim of authority to proceed against any statement she says is false—without showing the other traditional elements of fraud or consumer harm—deeply offends the First Amendment. Even assuming New York law gave her such extravagant enforcement power, the Constitution would restrain it.

### 1. The First Amendment entitles Plaintiffs to speak truthfully about off-label uses of prescription medicines.

Plaintiffs are entitled to speak truthfully about the use of progesterone for APR. In *United States v. Caronia*, the Second Circuit rejected the government's attempt to punish truthful speech about an off-label use of a medication, even in the commercial context. 703 F.3d 149, 152 (2d Cir. 2012). That ruling controls here.

*Caronia* overturned the conviction of a pharmaceutical sales representative prosecuted for the truthful promotion of off-label uses of a prescription medication. Critical to the court's ruling was that the FDA permits off-label uses of approved medications. *Id.* at 153. "[C]ourts and the FDA" recognize the "propriety and potential public value of unapproved or off-label drug use," which "is an 'accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine.'" *Id.* (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001)). Off-label use may even be a medically recognized standard of care, and it is ultimately up to physicians to evaluate all information and decide appropriate treatment. *Id.* at 167. Thus, even in a case of commercial speech to doctors, the First Amendment prohibited the government from restricting truthful statements about off-label uses. *Id.* at 164.

That conclusion applies with all the more force to this case, which does not concern commercial speech—that is, speech "solely related to the economic interests

9

of the speaker and its audience." *Id.* at 163. Nothing in New York or federal law forbids doctors from prescribing progesterone off label for APR. In fact, when Colorado enacted a law to disallow that treatment, it was invalidated under the First Amendment and the State did not appeal. *Bella Health & Wellness v. Weiser*, No. 1:23-cv-00939, 2023 WL 6996860 (D. Colo. Oct. 21, 2023). The First Amendment permits Christian nonprofits like Plaintiffs to speak truthfully about this service that they do not charge for and that doctors perform. Compl. ¶¶ 34–36.

APR has a sound basis in theory, scientific research, and clinical practice. Mifepristone acts by blocking the binding sites of progesterone, so introducing more progesterone to "compete" with the mifepristone helps reverse its effects. Ex. A, Francis Decl. ¶¶ 16–17, 25. Animal studies have shown "a clear progesterone-mediated reversal of an initiated mifepristone-induced termination,"[21] and studies of pregnant women have shown the same.[22] *Id.* ¶¶ 20–28. Moreover, there is no evidence that supplemental progesterone harms pregnant women or babies.[23] *Id.* ¶¶ 32–36. Progesterone "has been safely used during pregnancy for over 50 years." *Id.* ¶ 34. And pregnancy centers have witnessed countless APR success stories, including that of Maranda Halstead and her now-17-month-old daughter Myli'anna. Compl. ¶¶ 1–5; Decl. of Maranda Halstead, attached as Exhibit B. Physicians have recommended other drugs off label based on much thinner records consisting mostly of anecdotal evidence, particularly in situations like this where the circumstances make "clinical trials virtually impossible." *Porzecanski v. Azar*, 943 F.3d 472, 476 (D.C. Cir. 2019); *see* Ex. A, Francis Decl. ¶¶ 23, 39. The scientific record here amply shows that progesterone for APR works, and Plaintiffs are entitled to say so.

---

[21] Camilleri, ECF No. 2-6, *supra* note 5*;* Yamabe, ECF No. 2-3, *supra* note 3.
[22] Delgado, ECF No. 2-4, *supra* note 7.
[23] Guideline NG126 Update (Nov. 2021), ECF No. 1-12, *supra* note 15; DeBeasi, ECF No. 2-7, *supra* note 17.

> ## 2. The Attorney General is trying to censor speech she dislikes without traditional showings of knowledge, reliance, loss, or materiality to a victim or consumers.

The Attorney General disagrees, claiming that pregnancy centers' speech about using progesterone for APR is false. Of course, this is the perennial answer of any censor who seeks to silence protected speech—that someone must be stopped from saying what the censor insists is false. So the Attorney General invokes laws that let *her* decide what is true and false. N.Y. Gen. Bus. Law § 349(b) ("Whenever the attorney general shall believe, from evidence satisfactory to [her] ...."); N.Y. Exec. Law § 63(12) ("[T]he attorney general is authorized to take proof and make a determination of the relevant facts."). As the statutory arbiter of truth, she seeks to expand these laws far beyond their ordinary reach over business transactions to cover speech by Christian nonprofits about free aid. Compl. ¶¶ 22, 36, 45, 58.

Setting aside the problems of state law,[24] this theory runs headlong into the First Amendment's presumptive invalidation of content-based speech regulations. That presumption is subject to carve-outs for "the few 'historic and traditional categories [of content-based laws] long familiar to the bar,'" *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quotation omitted), which include prohibitions of fraud, *Donaldson v. Read Mag.*, 333 U.S. 178, 190 (1948). But the Attorney General's expansive enforcement theory lacks any of the guardrails of that

---

[24] These statutes do not apply here as a matter of state law. Executive Law § 63(12) applies only to statements "in the carrying on, conducting or transaction of business," not to speech by nonprofits about physician referrals. And because pregnancy centers charge nothing and receive nothing for those referrals, statements about it are not "directed to consumers" as required by General Business Law §§ 349 and 350. *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 326 (2002); *see also* Oxford Languages, Consumer ("a person who purchases goods and services for personal use"); *N.Y. Pub. Int. Rsch. Grp. v. Ins. Info. Inst.*, 161 A.D.2d 204, 205 (N.Y. App. Div. 1990) (holding statute applies only to "frauds or other deceptive practices arising out of commercial transactions ... and not to general expressions of opinion about public matters").

historic claim. She attempts to police speech that *she* decides is "fraudulent" without showing intent, reliance, loss, or materiality to a specific victim or to consumers in general. That violates the First Amendment.

Laws against fraud share a common core of elements that revolves around harm to specific victims. New York's civil fraud claim typifies these elements: it requires "clear and convincing evidence" of "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). Federal criminal fraud prohibitions closely track these elements, requiring an intent to defraud to obtain the victim's money or property through "material misrepresentations—that is, misrepresentations that would naturally tend to influence, or are capable of influencing, [the victim's] decisionmaking." *United States v. Johnson*, 945 F.3d 606, 612 (2d Cir. 2019). And even if these requirements might be relaxed under the state's authority to protect consumers, they still ultimately center on harm—harm to reasonable consumers "likely to be deceived" by the representation. *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013). At minimum, this demands "a causal connection between some injury to [consumers] and some misrepresentation made by defendants." *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 15 (App. Div. 1998), *aff'd*, 94 N.Y.2d 43 (1999).

The Supreme Court has recognized these safeguards as essential to upholding other state fraud statutes under First Amendment challenges. For example, in *Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003), the Court upheld an Illinois law preventing misrepresentations by telemarketers. The law there did not impose liability based on a "[f]alse statement alone," but rather required materiality, "the intent to mislead the listener, and succe[ss] in doing so"—that is, an injury to a victim. *Id.* at 620. And these showings

had to "be made by clear and convincing evidence." *Id.* Because "[e]xacting proof requirements of this order, in other contexts, have been held to provide sufficient breathing room for protected speech," the Supreme Court held that the First Amendment did not require an "exemption from fraud liability for a fundraiser who intentionally misleads in calls for donations." *Id.* at 620–21.

In contrast, the Attorney General has invoked the Business Fraud Statutes against pregnancy centers while ignoring these critical First Amendment limits. Her lawsuit seeks to punish allegedly false statements, but she does not allege knowledge of falsity. She identifies no fraud injury—neither a loss to a victim nor a corresponding benefit to the perpetrator. She makes conclusory allegations of representations to consumers, James Compl. ¶ 7, ECF No. 2-8, but there can be no consumers or monetary benefit when no client pays pregnancy centers any money for APR, which is prescribed by physicians, Compl. ¶¶ 35–36. Thus, she cannot allege materiality to consumers and she does not allege it for any specific person either. Nor anyone's reasonable reliance. And no specific resulting harm.

The only element of a traditional fraud claim the Attorney General alleges to support liability is false statements: "repeated and persistent misleading statements and omissions in the advertising of the Abortion Pill Reversal ('APR') protocol." [25] Notice, ECF No. 1-3; James Compl. ¶¶ 259–91, ECF No. 2-8. Not so. The statements Plaintiffs have made and wish to make about progesterone for APR are accurate and supported by science. Compl. ¶ 166. Further, there is no "general exception to the First Amendment for false statements." *Alvarez*, 567 U.S. at 718 (plurality op.). The government may punish false statements "made to effect a fraud or secure moneys or other valuable considerations ... without affronting the First

---

[25] The Attorney General does not allege materiality as to any specific victim, but only for consumers in general (who are not present here). *See* James Compl. ¶ 264, ECF No. 2-8.

Amendment," but the Attorney General's theory here is "not so limited in its reach." *Id.* Instead, she says the law allows her to impose massive civil liability, including penalties, injunctive relief, costs, attorney's fees and more, for noncommercial speech she thinks is wrong. By statute, penalties may include dissolution of Plaintiffs as functioning organizations. *See* N.Y. Exec. Law § 63(12).

As the Supreme Court has held, if the government's objection to the truth of a speaker's message were enough "to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition." *Alvarez*, 567 U.S. at 723 (plurality op.). "The *mere potential* for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.* (emphasis added). Especially so here where the consequences on the table are existential for pregnancy centers. Even if the centers the Attorney General has sued ultimately prevail in showing that their message about APR is well-grounded, Plaintiffs will experience the chilling of their protected, truthful speech for the whole duration of the proceeding. The process is part of the punishment.

### 3. The Attorney General's actions fail heightened scrutiny.

Against this background, the Attorney General's enforcement theory cannot survive constitutional scrutiny. Here, that standard is strict scrutiny because this speech is not commercial. *Caronia*, 703 F.3d at 163; *see also Becerra*, 585 U.S. at 768. Commercial speech is "speech that does no more than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001), or is "solely related to the economic interests of the speaker and its audience," *Caronia*, 703 F.3d at 163. That is simply not the case here. Pregnancy centers' speech about progesterone for APR—a service that physicians provide—proposes no transaction

14

and comes free of charge. Compl. ¶¶ 34–36. Even "the solicitation of charitable contributions" is not "purely commercial speech." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 788–89 (1988); *see also Transp. Alternatives, Inc. v. New York*, 340 F.3d 72, 78 (2d Cir. 2003). No commercial speech is at issue here.

As a result, the Attorney General must show that her enforcement is narrowly tailored to serve a compelling state interest in the least restrictive manner. *Caronia*, 703 F.3d at 163, 167. She cannot do so. Her draconian theory is so flawed that it "cannot survive even intermediate scrutiny." *Becerra*, 585 U.S. at 773. That standard demands both that the government action advance its asserted interest "to a material degree," rather than providing "only ineffective or remote support," and that it be "narrowly drawn"—that is, no "more extensive than necessary to serve the interest." *Caronia*, 703 F.3d at 164 (quotation omitted). The Attorney General cannot show either element.

First, the Attorney General's theory does not advance her asserted purpose. *Id.* In her lawsuit, she advocates not for protecting consumers from economic injury, but for preventing alleged *medical* harm to women from speech about a free service.[26] James Compl. ¶¶ 15–18, ECF No. 2-8. But progesterone treatment for APR is safe and effective, Ex. A, Francis Decl. ¶¶ 20–38, and the Attorney General has not identified anyone who has been medically harmed by pregnancy centers' speech about it. So attacking the pregnancy centers for this speech does nothing to protect women's health. Prescribing progesterone is entirely lawful, so "it does not follow that prohibiting the truthful promotion of off-label drug usage ... directly further[s] the government's goal[]" of protecting public health. *Caronia*, 703 F.3d at 166.

---

[26] Press Release, Off. of the N.Y. State Att'y Gen., Att'y Gen. James Sues Anti-Abortion Group and 11 New York Crisis Pregnancy Centers for Promoting Unproven Abortion Reversal Treatment (May 6, 2024), https://perma.cc/U572-Z6FR.

Second, the Attorney General's enforcement theory is not "narrowly drawn." *Id.* at 164. "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). New York has other statutes specifically directed to policing advertisements and other medical practices that lead to medical harm. N.Y. Educ. Law § 6530 (McKinney 2021); N.Y. Pub. Health Law § 230 (McKinney 2023). Of course, the Attorney General has not brought proceedings under those statutes— they lie outside her authority and are enforced by the board of professional medical conduct and department of health. So she has tried to police conduct committed to a different branch of state government by regulating pregnancy centers' speech. This underscores both the poor fit with her purpose and her overt animus in seeking any means available to punish pregnancy centers.

Plus, even assuming some regulation of speech here might be appropriate, a traditional fraud action would provide a narrowly drawn remedy. By including elements of knowledge, loss, reliance, materiality to the victim, and others, *Telemarketing Assocs., Inc.*, 538 U.S. at 620–21, often to be pled with particularity, *see* Fed. R. Civ. P. 9(b), and proven by clear and convincing evidence, *Schlaifer*, 119 F.3d at 98, traditional fraud claims regulate no more speech than is necessary. By forgoing these restraints, the Attorney General's aggressive enforcement strategy chills protected speech.

*Caronia* illustrates how particularly harmful this chill is in the medical context, where the loss of information that the Attorney General "paternalistically" deems false "interferes with the ability of physicians and patients to receive potentially relevant treatment information." 703 F.3d at 166. This "could inhibit, to the public's detriment, informed and intelligent treatment decisions." *Id.* The Attorney General has fashioned what is in effect a strict-liability "false statements" claim that threatens to quash the "open and vigorous expression of views in public

16

and private conversation [that] the First Amendment seeks to guarantee." *Alvarez*, 567 U.S. at 718 (plurality op.). She lacks a "reasonable fit" between her asserted government interests in women's health and her claim to be able to regulate any speech about it based on her view of its truth. *Caronia*, 703 F.3d at 168.

As the Supreme Court held in vindicating the First Amendment rights of pregnancy centers in *Becerra*, "the best test of truth is the power of the thought to get itself accepted in the competition of the market, and the people lose when the government is the one deciding which ideas should prevail." 585 U.S. at 772 (quotation omitted). That risk is particularly acute here given the long history of governments "manipulat[ing] the content of doctor-patient discourse to increase state power and suppress minorities." *Id.* at 771 (quotation omitted). That is why the Supreme Court has "consistently refused to recognize an exception [to the First Amendment] for any test of truth—whether administered by judges, juries, or administrative officials—and especially one that puts the burden of proving truth on the speaker." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 271 (1964).

Empowering the state to threaten false statements with crippling sanctions, up to dissolution of an organization, without showing economic injury or speech directed to consumers, would confer unlimited discretion to silence disfavored speech. It would permit the state to quash speech on "a host of good-faith disagreements" in the medical area on anything from "the ethics of assisted suicide" to "the benefits of medical marijuana." *Becerra*, 585 U.S. at 771. "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth." *Alvarez*, 567 U.S. at 723 (plurality op.) (citing G. Orwell, Nineteen Eighty-Four (1949)). The Court should enjoin the Attorney General's exercise of that power here against nonprofits that seek to serve, not exploit, New Yorkers.

17

**B.    The Attorney General's selective enforcement against pregnancy centers is unlawful.**

The Attorney General's selective enforcement of New York's Business Fraud Statutes here is also unlawful. As mentioned, viewpoint discrimination occurs when the government regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. Because it is a "blatant" and "egregious" form of content discrimination, *id.*, "viewpoint discrimination is scrutinized closely whether or not it occurs in the commercial speech context," *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018).

Here, the Attorney General "violates the First Amendment" by applying the law "in a viewpoint discriminatory manner." *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 95 n.9 (2d Cir. 2003). And while her "prosecutorial discretion is broad, it is not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (cleaned up). The Constitution forbids her from selectively enforcing the Business Fraud Statutes against the pro-life views of Christian pregnancy centers while leaving actually misleading statements by similarly situated abortion advocates untouched. A plaintiff shows selective enforcement by establishing two elements: (1) the plaintiff "was similarly situated in material respects to other individuals against whom the law was not enforced," and (2) "the selective enforcement infringed on a constitutional right." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023); *Wandering Dago,* 879 F.3d at 40. Both are met.

The pro-life pregnancy centers targeted by the Attorney General are similarly situated to Planned Parenthood affiliates. They serve the same relevant clientele— women seeking pregnancy-related services.[27] Compl., *Heartbeat Int'l, Inc. v. James*, No. E2024007242 (N.Y. Sup. Ct., Monroe Cnty, Apr. 30, 2024) ¶ 8, attached as Exhibit C; Compl. ¶ 292. They provide or refer for many of the same services—*e.g.,*

---

[27] Planned Parenthood Greater N.Y., *Our Services*, https://perma.cc/BG3X-MMHL.

pregnancy testing and options counseling, STI testing, medical examinations, and adoption referrals.[28] Ex. C, Heartbeat Compl. ¶¶ 85–87; Compl. ¶¶ 76, 293. Heartbeat International and NIFLA are similarly situated to the national Planned Parenthood organization, as all provide resources and support to their affiliates to further their respective missions.[29] Ex. C, Heartbeat Compl. ¶¶ 28–31; Compl. ¶¶ 27, 290. And they all speak about the safety and effectiveness of the services they promote: Planned Parenthood and its affiliates about chemical abortion;[30] and Heartbeat, NIFLA, and their affiliates about APR.[31] Ex. C, Heartbeat Compl. ¶¶ 34, 62, 96; Compl. ¶¶ 28, 165.

Planned Parenthood touts chemical abortion as "really safe and effective."[32] But mifepristone poses well-known serious risks. Ex. A, Francis Decl. ¶¶ 13–15. Its label includes a black-box warning—"the most serious warning placed on prescription medication labels," *Caronia*, 703 F.3d at 155—that "serious and sometimes fatal infections or bleeding" may occur.[33] The label also cites evidence that roughly 1 in 25 women who take the drug end up in the emergency room.[34] That is why the FDA determined that mifepristone may not be used without special safeguards known as REMS.[35] Planned Parenthood does not mention these facts.

---

[28] *Id.*; Planned Parenthood of Greater New York, *Pregnancy Testing and Planning*, https://perma.cc/5DKF-G28K.

[29] Planned Parenthood, *Mission*, https://perma.cc/MT96-N5K3.

[30] Planned Parenthood, *How Safe Is the Abortion Pill?,* https://perma.cc/PWW2-Q4AY; Planned Parenthood of Greater N.Y., *The Abortion Pill*, https://perma.cc/6GE8-49RF.

[31] Abortion Pill Reversal / Abortion Pill Rescue Network, *Abortion Pill Reversal*, abortionpillreversal.com.

[32] *How Safe Is the Abortion Pill?, supra* note 30.

[33] Food and Drug Administration, *Mifeprex (mifepristone) Label* (Jan. 2023), https://perma.cc/4895-X457.

[34] *Id.*

[35] *Id.*

Pregnancy centers are a stark comparison. Rather than extolling the safety of mifepristone, a drug with a black-box warning and stringent safety protocols, they speak about progesterone, a naturally occurring hormone safely administered to pregnant women for over 50 years. Ex. A, Francis Decl. ¶ 34. And rather than charging for their services, as Planned Parenthood does,[36] they offer them for free. Ex. C, Heartbeat Compl. ¶¶ 63, 66, 88; Compl. ¶¶ 35–36, 80. Indeed, under state law, pregnancy care centers in New York cannot provide progesterone treatments but may only refer to physicians who may prescribe it in their independent judgment. Yet the Attorney General has sued pregnancy centers, not Planned Parenthood. Compl. ¶ 301.

The Attorney General attacks pro-life organizations because of their pro-life views. She has echoed Planned Parenthood's claim that "mifepristone is safe and effective" over 20 times in the past two years,[37] and she begins her Complaint against Heartbeat by declaring her stance that "[m]edication abortion is ... safe and effective." James Compl. ¶ 1, ECF No. 2-8. In her own words, she targets "opponents of abortion" who "seek to deter pregnant individuals who have begun the process of a medical abortion from completing that process." *Id.* ¶ 4. She recognizes that the primary difference between Planned Parenthood affiliates and pregnancy centers is that Planned Parenthood affiliates provide abortions,[38] whereas pregnancy centers "do not provide abortion counseling or referrals"[39] in accord with their Christian beliefs. *Id.* ¶ 5; Compl. ¶¶ 30–31, 294. But when government "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First*

---

[36] Planned Parenthood, *How much does the abortion pill cost?*, https://perma.cc/XS4J-LHVU.
[37] NY AG James, @NewYorkStateAG, https://perma.cc/3XEH-TZQ2.
[38] Planned Parenthood, *Abortion*, https://perma.cc/MGR6-FA4V.
[39] Press Release, *supra* note 26.

*Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86 (1978). Just as she cannot justify applying the Business Fraud Statutes against Plaintiffs, *see* Section I.A.3, she cannot justify her selective enforcement against pregnancy centers.

Plaintiffs' religiously motivated and constitutionally protected pro-life speech has been chilled by the Attorney General's unlawful selective enforcement. Compl. ¶¶ 165–236; *Rosenberger*, 515 U.S. at 829. The Court should enter the requested injunction to lift this chill on Plaintiffs' speech.

### C.   The Attorney General's enforcement of the Business Fraud Statutes against pregnancy centers violates religious freedom.

The Attorney General's actions against faith-based pregnancy centers also violates the First Amendment's Free Exercise Clause, which "work[s] in tandem" with the Free Speech Clause. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523 (2022). Like the organizations the Attorney General has already sued, Plaintiffs are all Christian organizations whose statements about APR are rooted in their sincere religious beliefs. Ex. C, Heartbeat Compl. ¶ 8; Compl. ¶¶ 23, 47, 68, 196, 296, 377. The Attorney General is violating the Free Exercise Clause by singling out these religious beliefs and targeting these statements for unfavorable treatment.

The Free Exercise clause forbids "governmental hostility" to religion, whether it be "overt" or "masked." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). So if state action "targets religious conduct for distinctive treatment," it is not "shielded by mere compliance with the requirement of facial neutrality." *Id.* State action may not be based "on hostility to a religion or religious viewpoint." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Action that is not neutral or not generally applicable will be upheld only if it satisfies strict scrutiny. *M.A. on behalf of H.R. v. Rockland Cnty. Dep't of Health*, 53 F.4th 29, 36 (2d Cir. 2022).

The Attorney General has shown such hostility. The hostility inquiry turns on the "historical background of the decision," "contemporaneous statements" made by the decisionmaker, and "the effect of" government action "in its real operation." *Lukumi*, 508 U.S. at 535, 540; *Masterpiece Cakeshop*, 584 U.S. at 638. Here, the Attorney General has expressed hostility toward pregnancy centers' faith-based, pro-life message and activities for many years. In 2018, she described them as "fake clinics" and accused them of lying and "actively trick[ing] and lur[ing]" women into using their services.[40] *Cf. M.A.*, 53 F.4th at 37–38 (finding derogatory comments about "anti-vaxxers" could be evidence of religious targeting). She publicized her intent to attack those who share pro-life views, including sidewalk counselors and pregnancy centers who "counsel women against terminating their pregnancies."[41]

The Attorney General's harassment of pro-life pregnancy centers continued in 2022, when she successfully pressured Google to discriminate against those centers because they "exist to discourage people from having an abortion."[42] She boasted on Twitter, "I called on @Google to fix its @googlemaps search results to stop directing people to anti-abortion clinics known as crisis pregnancy centers, and today Google is doing just that."[43] Then in 2023, she signed an open letter with 15 other attorneys general decrying the proliferation of "anti-abortion crisis pregnancy

---

[40] Letitia James & Andrea Miller, *With Fake Clinics Proliferating, New Yorkers Should Know Their Reproductive Health Care Rights* (Sep. 24, 2018), GOTHAM GAZETTE, https://perma.cc/6AMY-82DQ.

[41] Jillian Jorgensen, *AG candidate Letitia James would seek broad authority to prosecute those who block abortion clinics* (Jul. 26, 2018), NEW YORK DAILY NEWS, https://perma.cc/3QE7-EYQC.

[42] NY AG James (@NewYorkStateAG), X (Jun. 29, 2022, 2:50 PM), https://perma.cc/5FAS-MQ3K; Press Release, Off. of the N.Y. State Att'y Gen., Att'y Gen. James Applauds Google for Improving Search Results for Individuals Seeking Abortion Care (Aug. 25, 2022) https://perma.cc/LB65-QD2G; NY AG James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/M59B-NJDZ.

[43] NY AG James (@NewYorkStateAG), X (Aug. 25, 2022, 2:06 PM), https://perma.cc/H9JC-KNCH.

centers."[44] Today, her official website as attorney general instructs readers to not "share any personal information" with a center that is not "a real health care facility that offers abortion services or referrals."[45]

This hostility toward pro-life centers culminated in the Attorney General's lawsuit against pregnancy centers for purported "false and misleading" statements promoting APR.[46] The weak merits of her legal claims show just how far she will go to suppress pregnancy centers' faith-based message: She tries to stretch New York's Business Fraud Statutes—designed to protect consumers from business fraud—to the speech of Christian nonprofits who provide lawful services *for free*.

That the Attorney General did not expressly mention the religious beliefs of these organizations in her lawsuit is immaterial. It is no coincidence that *all* the pregnancy centers she is now targeting are Christian. Ex. C, Heartbeat Compl. ¶ 8. The promotion of progesterone for APR is closely linked to their religious conviction that life begins at conception and great efforts should be made to save unborn lives. Compl. ¶¶ 31–32, 70, 195. The Attorney General knows the religious nature of pro-life pregnancy centers' activities: she admits that "[m]any are affiliated with religious organizations that oppose abortion"[47] and that they offer "religious-based programming."[48] This attack on pregnancy centers' APR messages is an obvious and unwarranted attack on Christian organizations.

The Attorney General's own statements show the object of her actions is to suppress the faith-based pro-life message promoting APR, and in "operation" they have their intended effect. *Lukumi*, 508 U.S. at 535. Her lawsuit has chilled the

---

[44] Att'y Gen. Rob Bonta, *supra* note 20.
[45] *Reproductive Rights*, Off. of the N.Y. State Att'y Gen., https://perma.cc/6RCA-Q4NU.
[46] Press Release, *supra*, note 26.
[47] *Reproductive Rights*, *supra* note 45.
[48] Att'y Gen. Rob Bonta, *supra* note 20.

religious speech and exercise of not only the parties she has sued, Ex. C, Heartbeat Compl. ¶ 18, but also that of Plaintiffs here, Compl. ¶¶ 29, 39.

The Attorney General's actions are not neutral or generally applicable for two more reasons. First, her position that the Business Fraud Statutes allow her to sue to silence speech she thinks is false without the elements of fraud amounts to a system of individualized assessments. *Lukumi*, 508 U.S. at 537. Second, a state does not act neutrally when it "treat[s] *any* comparable secular activity"—here, Planned Parenthood's speech—"more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). This is another "indication of hostility," *Masterpiece Cakeshop*, 584 U.S. at 636, and it shows a lack of general applicability because "it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia,* 593 U.S. 522, 534 (2021). The Attorney General's actions are plainly subject to strict scrutiny and fail for the reasons in Section I.A.3.

## II.   The other preliminary-injunction factors favor Plaintiffs.

Plaintiffs are suffering irreparable harm due to the chilling effect of the Attorney General's enforcement of the Business Fraud Statutes against similar pro-life organizations. *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976); *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996). Before the Attorney General sent her Notices of Intention to Sue, NIFLA encouraged its New York members to provide APR referrals. Compl. ¶¶ 177–79. Some of these New York centers, including Gianna's House and Options Care Center, made public statements promoting abortion pill reversal. *Id.* ¶¶ 199, 208, 216, 223–26. Options Care Center also referred for APR. *Id.* ¶ 65. But since the Attorney General issued her Notices, NIFLA has stopped urging New York centers who are not already offering APR to do so. *Id.* ¶ 187. And some of NIFLA's New York members, including Gianna's House and Options Care Center, have since removed statements about APR from their websites, despite

their firm belief that the statements are accurate and despite their desire to continue making those statements. *Id.* ¶¶ 170–71, 212, 230. The chilling of this protected speech is irreparable harm.

The balance of hardships also tips sharply in favor of Plaintiffs. Without an injunction, they will be harmed every day they are chilled from speaking about and offering APR. Against this present First Amendment harm, the Attorney General has no irreparable harm. In her lawsuit against Heartbeat, she has not alleged any actual harm caused by the speech she wishes to censor. Any allegations about any such harm would be utterly speculative and unsupported.

An injunction would also serve the public interest "in the fullest possible dissemination of information." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561–62 (1980). An individual's interest in the "free flow" of information—even commercial information—"may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 763 (1976). Just as "advertisements stating that referral services for legal abortions are available" are of general public interest, so too are the pregnancy centers' statements advertising the availability of referral services for abortion pill reversal. *Id.* at 764 (citing *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975)). Women who have taken mifepristone and regret it, like Maranda Halstead, have a priceless interest in information that could help them save their unborn child's life. The Court should reject the Attorney General's paternalism that would keep them in the dark about their options.

## CONCLUSION

The Court should issue a preliminary injunction prohibiting the Attorney General from enforcing the Business Fraud Statutes against Plaintiffs and their members for speaking about the use of progesterone for APR.

Dated: May 24, 2024     Respectfully submitted,


J. Caleb Dalton*      */s/ Michael G. McCartin*
Gabriella M. McIntyre*     Michael G. McCartin
Allison H. Pope*       Michael G. McCartin Law PLLC
Alliance Defending Freedom   38 Mall Way #513
44180 Riverside Pkwy     West Sand Lake, New York 12196-9998
Lansdowne, VA 20176     WDNY Bar Roll No. 2447712
Tel: (571) 707-4655      Tel: (518) 953-3333
cdalton@adflegal.org     mccartinlaw@gmail.com
apope@adflegal.org
gmcintyre@adflegal.org     Erin M. Hawley*
             Lincoln Davis Wilson**
             Timothy A. Garrison*
             Alliance Defending Freedom
             440 First Street NW, Suite 600
             Washington, DC 20001
             Tel: (202) 393-8690
             ehawley@adflegal.org
             lwilson@adflegal.org
             tgarrison@adflegal.org


*Counsel for Plaintiffs*

*Pro hac vice to be filed

**Application for admission to be filed