UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FILED
AUG 2 2 2024
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

NATIONAL INSTITUTE FOR FAMILY
AND LIFE ADVOCATES, GIANNA'S
HOUSE, INC., and CHOOSE LIFE OF
JAMESTOWN, INC. d/b/a
OPTIONS CARE CENTER,

        Plaintiffs,

    v.

LETITIA JAMES, in her official
capacity as Attorney General of the
State of New York,

        Defendant.

24-CV-514 (JLS)

## DECISION AND ORDER
## (PRELIMINARY INJUNCTION)

Two pregnancy centers and a related association seek a preliminary injunction against future Attorney General enforcement litigation based on their speech, namely, that the abortion pill reversal ("APR") protocol is safe and effective for a pregnant woman to use, with her doctor, to reverse the effects of a first chemical abortion pill and, thereby, help to save the life of her unborn child. Their motion is granted.

As explored more fully below, the First Amendment's freedom of speech clause means that, as "a general matter . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (*plurality opn.*) (internal

quotation marks and citation omitted). *Absent from* the "few categories" where the law "allows content-based regulation of speech is any general exception to the First Amendment for false statements." *Id.* at 718. *Even assuming the potential for a false statement on this record*, which is disputed, the law recognizes "that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id.*

More to the point—our Constitution and Constitutional tradition stand "against the idea that we need Oceania's Ministry of Truth." *Id.* at 723 (citing G. Orwell, Nineteen Eighty–Four (1949) (Centennial ed. 2003)). In fact, if an "interest in truthful discourse alone [were] sufficient to sustain a ban on speech, absent any evidence that the speech was used to gain a material advantage, it would give government a broad censorial power unprecedented in [the Supreme] Court's cases or in our constitutional tradition." *Id.* The "mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id.*

Fundamentally, freedom of speech and thought "flows not from the beneficence of the state but from the inalienable rights of the person." *Id.* at 728. Suppression "of speech by the government can make exposure of falsity more difficult, not less so." *Id.* Society "has the right and civic duty to engage in open, dynamic, rational discourse"—ends that "are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.*

These foundational principles animate the likelihood-of-success discussion below. In sum, on this record, Plaintiffs have standing. No abstention doctrine applies. And no other prudential, discretionary, or equitable obstacle to such relief exists. Based on a careful application of the preliminary injunction factors, especially as they relate to Plaintiffs' First Amendment Free Speech claim, the motion for a preliminary injunction is GRANTED.

## BACKGROUND

### I.   PLAINTIFFS' VERIFIED COMPLAINT[1]

Plaintiffs National Institute for Family and Life Advocates ("NIFLA"), Gianna's House, Inc. ("Gianna's House"), and Choose Life of Jamestown, Inc. d/b/a Options Care Center ("Options Care Center") (collectively, "Plaintiffs"), commenced this action on May 24, 2024. Dkt. 1.[2] They sue Defendant Letitia James (the "Attorney General" or the "State") in her official capacity as Attorney General of the State of New York. *See id.*

NIFLA is a "501(c)(3) nonprofit, faith-based organization incorporated under the laws of Virginia and with a principal place of business in Fredericksburg, Virginia." *Id.* ¶ 22. It is a "Christian, non-denominational ministry" with "member pregnancy centers located across the nation, including 51 centers in New York." *Id.*

---

[1] This section contains a summary of Plaintiffs' allegations. For a full recitation, see Dkt. 1.

[2] Unless otherwise noted, page numbers refer to the CM/ECF stamped pagination in the header of each page.

¶¶ 23-24.  NIFLA's mission, among other things, "is to empower women and men facing unplanned pregnancies to choose life and to protect life-affirming pregnancy centers by equipping them with legal resources, counsel, education, training, and support." *Id.* ¶ 27.

Gianna's House is one of NIFLA's New York members. *Id.* ¶ 25.  It is "a 501(c)(3) nonprofit, faith-based organization incorporated under the laws of New York and with a principal place of business in Brewster, New York." *Id.* ¶ 45. Gianna's House is a "Catholic ministry" that "seeks to empower women experiencing unexpected pregnancies, as well as the fathers of those babies, to break down obstacles and choose life for their children." *Id.* ¶ 47.  It "offers a variety of free services, including self-administered pregnancy tests, options counseling, peer counselors and individual mentors, motherhood and fatherhood groups and educational classes, material aid, post-abortion support, and referrals for related services." *Id.* ¶ 48.

Options Care Center is also one of NIFLA's New York members. *Id.* ¶ 26. Options Care Center "is a 501(c)(3) nonprofit, faith-based organization incorporated under the laws of New York and with a principal place of business in Jamestown, New York." *Id.* ¶ 58.  It serves "women and men in its community" by "equipping them with knowledge to make educated and life-affirming choices regarding sexual health and pregnancy," and supports "pregnant women and their families throughout pregnancy and beyond." *Id.* ¶ 60.  To "fulfill its mission, Options Care Center offers self-administered pregnancy tests; parenting education

and healthy relationship classes; compassionate post-abortion care and support; and information regarding parenting, adoption, and abortion to women facing unplanned pregnancies." *Id.* ¶ 63.

Plaintiffs allege that the Attorney General "has targeted pro-life centers for disfavored treatment because of their pro-life and religious viewpoints." *Id.* ¶ 237. Specifically, she "institute[ed] a civil enforcement action"[3] against "eleven faith-based, pro-life pregnancy centers," as well as a "network of affiliated centers" based on their speech about APR. *See id.* ¶¶ 157, 160.[4] According to Plaintiffs, the Attorney General has "concocted an unconstitutional and expansive interpretation of [New York law] to institute aggressive proceedings against pro-life pregnancy centers for their truthful statements about progesterone treatment." *Id.* ¶ 156. As a result of the Attorney General's enforcement action, Plaintiffs "have censored their constitutionally protected speech in order to avoid prosecution by the Attorney General." *Id.* ¶ 424.

The Complaint sets forth the following causes of action:

- Violation of Plaintiffs' First Amendment Right to Freedom of Speech: Content-Based Discrimination, Viewpoint-Based Discrimination, Unbridled Discretion, and Overbreadth;

---

[3] The state litigation is discussed in detail in Section II, *infra*. None of the Plaintiffs is a party to the state enforcement litigation.

[4] If "a woman has taken mifepristone but has not yet taken misoprostol and decides she would like to continue her pregnancy, she may request supplemental progesterone to try to counter the effects of mifepristone." *Id.* ¶ 121. This "progesterone treatment is commonly called 'Abortion Pill Reversal,' or APR." *Id.*

- Violation of Plaintiffs' First Amendment Right to Free Exercise; and

- Violation of Plaintiffs' Fourteenth Amendment Right to Due Process: Vagueness.

*Id.* ¶¶ 311-426.  Plaintiffs seek various forms of relief, including a preliminary and permanent injunction, declaratory relief, and attorneys' fees.  *Id.* at 66 (prayer for relief).

## II.    THE ENFORCEMENT ACTION

On May 6, 2024, the Attorney General commenced a civil enforcement action in Supreme Court, New York County, against Heartbeat International, Inc., and eleven faith-based, pro-life pregnancy centers (collectively, the "HBI Defendants"). *See People of the State of New York v. Heartbeat Int'l, Inc., et al.*, Index No. 451314/2024 (N.Y. Sup. Ct., N.Y. Cty. 2024).[5]  None of the HBI Defendants is a Plaintiff here.

The Attorney General alleges that Heartbeat International, Inc. "is the architect of a strategic and coordinated marketing campaign through which local [pro-life pregnancy help organizations ("PHOs")] . . . promote APR in their communities using advertising schemes and materials, including those created by HBI." *Id.* Dkt. 1 ¶ 7.  The HBI Defendants allegedly "carry out this campaign by

---

[5] The HBI Defendants also commenced a civil action against the Attorney General in Supreme Court, Monroe County.  *See Heartbeat Int'l, Inc., et al. v. James*, Index No. E2024007242 (N.Y. Sup. Ct., Monroe Cty. 2024).  The actions have been consolidated under the Monroe County case.  *See id.*, Dkt. 38 (consolidation order). The Court will refer to the consolidated action as the "Enforcement Action."

unlawfully advertising APR to consumers through misleading and/or false statements and omissions on their public websites and marketing materials, on various social media platforms, and through targeted advertising campaigns." *Id.* According to the Attorney General, "[i]n their websites and other promotional materials, [the HBI] Defendants have made repeated and persistent misleading and/or false claims and omissions about APR's efficacy and safety." *Id.* ¶ 9. She claims that there "is no competent and reliable scientific evidence to substantiate [the HBI] Defendants' claims about APR's efficacy and safety," *id.* ¶ 11, and it is "extremely difficult for the average consumer to verify the accuracy of claims concerning efficacy and safety made in health care marketing." *Id.* ¶ 16.

The Enforcement Action pursues five causes of action against the HBI Defendants under New York Executive Law § 63(12) and New York General Business Law Article 22-A, §§ 349 and 350 (collectively, the "New York Statutes"). *See id.* ¶¶ 259-291. The Attorney General seeks "an injunction to stop [the HBI] Defendants' misleading advertising; equitable relief to redress Defendants' fraudulent and unlawful conduct; and the imposition of civil penalties and costs." *Id.* ¶ 19.

## III.   PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

Plaintiffs here move for a preliminary injunction. Dkt. 3. They argue that they are "suffering irreparable harm due to the chilling effect of the Attorney General's enforcement of [the New York Statutes] against similar prolife organizations." Dkt. 3-1 at 32. They assert that they "have a First Amendment

7

right to speak truthfully, including about off-label uses of prescription medicines

. . . ." Dkt. 3-1 at 10.  But their "religiously motivated and constitutionally protected

pro-life speech has been chilled by the Attorney General's unlawful selective

enforcement." *Id.* at 29.[6]  As such, Plaintiffs seek an order "barring Defendant

Letitia James, her agents, officials, servants, employees, and any other persons

acting on her behalf from enforcing New York General Business Law Article 22-A,

§§ 349 and 350 and New York Executive Law § 63(12) against Plaintiffs and their

members for speaking about the use of progesterone for abortion pill reversal."  Dkt.

3 at 1.

The Attorney General argues that "this Court should abstain from exercising

jurisdiction over these claims while the [Enforcement Action] is pending, Plaintiffs

have not suffered an injury sufficient to establish standing, and their claims are not

constitutionally or prudentially ripe for review."  Dkt. 20 at 9.  She further argues

that Plaintiffs' claims fail on the merits. *Id.* at 9-10.  Plaintiffs replied.  Dkt. 27-28.

On August 15, 2024, the Court held a hearing based on written evidentiary

submissions. *See* Dkt. 31.

## DISCUSSION

Plaintiffs' motion for a preliminary injunction is granted.  As discussed below,

Plaintiffs have standing.  Their claims are ripe for adjudication.  No abstention

doctrine applies.  The Court has carefully considered the preliminary injunction

---

[6] Plaintiffs also argue that the Attorney General's actions "violate the Free Exercise
Clause through her hostility to the pregnancy centers' pro-life, Christian viewpoint."
*Id.* at 10.

factors.  Plaintiffs are likely to succeed on the merits of their First Amendment Free

Speech claim, and they are suffering irreparable harm each day that their

Constitutional freedoms are infringed.  The remaining factors also favor relief here.

## I.    STANDING

The "fundamentals of standing are well-known and firmly rooted in American

constitutional law." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367,

380 (2024).  By "limiting who can sue, the standing requirement implements 'the

Framers' concept of the proper—and properly limited—role of the courts in a

democratic society.'"  *Id.* (quoting J. Roberts, Article III Limits on Statutory

Standing, 42 Duke L. J. 1219, 1220 (1993)).  The "threshold question," therefore, "is

whether the plaintiffs have standing to sue under Article III of the Constitution."

*Id.* at 378.  On this record, Plaintiffs have standing.[7]

### A.    Legal Standard

To establish standing, "a plaintiff must demonstrate (i) that [it] has suffered

or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be

caused by the defendant, and (iii) that the injury likely would be redressed by the

---

[7] As discussed below, each Plaintiff, individually, has standing.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (Standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . .").  Additionally, Plaintiff NIFLA "acknowledges that circuit precedent appears to preclude it from seeking relief on behalf of any members at this time." Dkt. 27 at 10 (citing *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)).  But NIFLA "preserves the argument that that precedent is wrong."  *Id.*  To the extent NIFLA seeks to assert the rights of its members, the issue is accordingly resolved against it and, thereby, preserved for appellate review.

requested judicial relief." *Food & Drug Admin.*, 602 U.S. at 368 (citing *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

Only the first element of the test, *i.e.*, whether the Plaintiffs have suffered an injury in fact, bears discussion here (though there is a likelihood of success on the merits as to all of them). An injury in fact exists where a plaintiff "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 555). In the context of a pre-enforcement challenge—as in this case—a plaintiff must demonstrate "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest; (2) that the intended conduct is proscribed by the challenged law; and (3) that there exists a credible threat of prosecution thereunder." *Vitagliano v. County of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)).[8]

The identification of a "credible threat" necessarily "depends on the particular circumstances at issue. . . ." *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022) (citing *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016)). But a plaintiff need not first "expose [itself] to liability before bringing suit to challenge

_____

[8] While "many pre-enforcement cases involve a threat of criminal prosecution, the 'fear of civil penalties' can likewise be sufficient." *Nastri v. Dykes,* No. 23-1023, 2024 WL 1338778, at *1 (2d Cir. Mar. 29, 2024) (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)).

the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007)).

Moreover, it is "well-established" that, where "'a statute specifically proscribes conduct, the law of standing does not place the burden on the plaintiff to show an intent by the government to enforce the law against it.'" *Vitagliano*, 71 F.4th at 138 (quoting *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019)). Rather, the Court "presume[s] such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed." *Id.* (internal citation omitted). Indeed, the "credible-threat standard 'sets a low threshold and is quite forgiving to plaintiffs seeking such pre[-]enforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Id.* (quoting *Cayuga Nation*, 824 F.3d at 331). The history of similar enforcement is relevant here too.

## B.    Analysis

Plaintiffs have demonstrated an injury-in-fact.[9] They allege "an intention to engage in a course of conduct" arguably protected by the First Amendment but proscribed by New York law. *See id.* at 136. Specifically, each Plaintiff has previously made statements about APR. *See, e.g.,* Dkt. 1 ¶ 56 ("In the past, Gianna's House has made various statements about progesterone treatment . . . .");

---

[9] The Court applies the preliminary injunction standard throughout.

¶ 71 ("Prior to the Attorney General's censorship campaign against faithbased, pro-life pregnancy centers, Options Care Center made various statements about progesterone treatment . . . ."); ¶ 172 ("Prior to the Attorney General's censorship campaign against faithbased, pro-life pregnancy centers, NIFLA made various statements about progesterone treatment to its New York members").

And Plaintiffs are now "chilled" from making future statements due to fear of civil enforcement by the Attorney General. *See, e.g., id.* ¶ 29 ("NIFLA's own speech is chilled and altered and its mission is impaired by the Attorney General's censorship campaign against APR content"); ¶ 39 ("New York NIFLA members' speech, including that of Gianna's House and Options Care Center, is chilled because of the Attorney General's censorship campaign against pro-life pregnancy centers"). *See Silva v. Farrish*, 47 F.4th 78, 87 (2d Cir. 2022) ("The plaintiffs previously fished in the Shinnecock Bay in violation of the state fishing regulations, and according to their complaint they are 'deterred and chilled' from doing so again because they fear prosecution").

Further, Plaintiffs allege a "credible threat" of future enforcement. Plaintiffs have, or intend to, use the term "Abortion Pill Reversal," refer to the website AbortionPillReversal.com, and/or indicate that APR is safe and effective. *See, e.g.,* Dkt. 1 ¶¶ 176, 203, 220, 182, 204, 221, 185, 223, 225, 208, 223. Such statements mirror statements against which the Attorney General has already taken enforcement action. *See, e.g., People of the State of New York v. Heartbeat Int'l, Inc., et al. v. James*, Index No. 451314/2024 (N.Y. Sup. Ct., N.Y. Cty. 2024), Dkt. 1

("*James* Cmplt.") ¶¶ 111, 99-100, 10, 141, 253.  Plaintiffs made these statements in the same, or a similar, context to that which the Attorney General views as consumer-oriented in the Enforcement Action.  *Compare, e.g.*, Dkt. 1 ¶¶ 224-225, 170, 199, 216, 230, 178, 169 *with James* Cmplt. ¶¶ 7, 9, 96-97, 263.

Because the Attorney General does not disavow enforcement as to Plaintiffs, the Court presumes that she will enforce the law in the manner that she previously has.  *See Vitagliano*, 71 F.4th at 138.  Indeed, "'past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical.'"  *Silva*, 47 F.4th at 87 (quoting *Driehaus*, 573 U.S. at 164).  And "there is every reason to think that similar speech in the future will result in similar proceedings."  *Driehaus*, 573 U.S. at 163.  For these reasons, each Plaintiff has standing.

## II.   RIPENESS

The Attorney General further argues that Plaintiffs' claims are not ripe for adjudication because Plaintiffs' injuries are not sufficiently imminent and, as a prudential matter, their claims would be better entertained after resolution of the Enforcement Action.  *See* Dkt. 20 at 29-32.  The Court disagrees.

Constitutional ripeness is "a specific application of the actual injury aspect of Article III standing."  *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013).  In other words, it is "really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'"  *Id.* (quoting *Lujan*, 504 U.S. at 560).  *See also New York C.L. Union v. Grandeau*, 528

F.3d 122, 130n.8 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical") (internal citation and alterations omitted).

As discussed above, Plaintiffs' constitutional harms are sufficiently "actual and imminent" to constitute an injury in fact. *See* Section I, *supra*. For those same reasons, Plaintiffs' claims are also ripe for adjudication. *See Ross v. Bank of Am.*, N.A.(USA), 524 F.3d 217, 226 (2d Cir. 2008) ("We have already held that the antitrust harms asserted by the cardholders are sufficiently 'actual and imminent' to constitute Article III injury in fact. For the same reasons, we find that these alleged injuries are not merely speculative or hypothetical, and that judicial review of the cardholders' claims at this time is appropriate").

Moreover, to the extent the Attorney General would have this Court "deem [Plaintiffs'] claims nonjusticiable on grounds that are prudential, rather than constitutional, [t]hat request is in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide' cases within its jurisdiction is virtually unflagging." *Driehaus*, 573 U.S. at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 124 (2014)) (internal quotation marks omitted). Under this caselaw, the Court sees no reason, on these facts, to decline to adjudicate this case on "prudential" grounds.

## III.   ABSTENTION

The State also argues that the Court should abstain from adjudicating this case, citing various doctrines—including *Younger*, *Colorado River*, *Pullman*, and the Declaratory Judgment Act. *See* Dkt. 20 at 14-22. None applies.

### A.   *Younger* Abstention

The Attorney General urges this Court to abstain under *Younger v. Harris,* 401 U.S. 37 (1971). She argues that the "Enforcement Action will fully address and resolve the issues presented by Plaintiffs in this litigation." *Id.* at 15. Plaintiffs respond that *Younger* does not apply because no Plaintiff in this case is a party—or inextricably intertwined with a party—to the Enforcement Action. *See* Dkt. 27 at 9-13. And because Plaintiffs are not parties to the Enforcement Action, they "do not have an adequate opportunity for judicial review of their claims." *Id.* at 13. On this record, *Younger* abstention is not warranted.

Federal courts "should generally refrain from enjoining or otherwise interfering in ongoing state proceedings." *Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (citing *Younger*, 401 U.S. at 43–45). The Supreme Court, however, instructs that a court should not abstain "simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). And "federal courts ordinarily *should* entertain and resolve on the merits an action within the scope of a jurisdictional grant . . . ." *Id.* at 73 (internal citation and alterations omitted) (emphasis added). As such, the circumstances "fitting within the *Younger* doctrine"

are "exceptional." *Id.* (internal citations and alterations omitted). They include: "state criminal prosecutions, civil enforcement proceedings, and civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id.*

When *Younger* applies to "instances of civil enforcement," such actions are "characteristically initiated to sanction the *federal plaintiff*, *i.e.*, the party challenging the state action, for some wrongful act." *Id.* at 79 (emphasis added). And in "cases of this genre, a state actor is routinely a party to the state proceeding and often initiates the action." *Id.*

It is not, however, a "prerequisite to *Younger* abstention that the federal plaintiffs also be defendants in the action pending in state court." *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881 (8th Cir. 2002). In "certain circumstances," *Younger* "may apply to the claims of third-parties who are not directly involved in any pending state proceeding." *Spargo*, 351 F.3d at 82. Specifically, where "the plaintiffs' interests are so inextricably intertwined that direct interference with the state court proceeding is inevitable, *Younger* may extend to bar the claims of plaintiffs who are not parties to the pending state proceeding." *Id.* (internal citation omitted). But in "applying *Younger* to third-parties," the Court "should be sensitive to the fact that, 'abstention from the exercise of federal jurisdiction is the narrow exception, not the rule.'" *Id.* (quoting *Cecos Int'l, Inc. v. Jorling*, 895 F.2d 66, 70 (2d Cir. 1990)).

Here, the "narrow exception" permitting abstention from third-party claims does not apply. Plaintiffs do not seek to enjoin the Enforcement Action. Nor do they seek a stay of a state court action or order. Rather, each Plaintiff seeks to vindicate its own First Amendment rights. And, significantly, NIFLA does not seek relief on behalf of its members who are subject to the Enforcement Action. *See* Dkt. 27 at 10. As discussed, each Plaintiff has standing based on alleged suppression of its own speech. *See, e.g.*, Dkt. 1 ¶ 39 ("New York NIFLA members' speech, including that of Gianna's House and Options Care Center, is chilled because of the Attorney General's censorship campaign against pro-life pregnancy centers"); ¶ 29 ("NIFLA's own speech is chilled and altered and its mission is impaired by the Attorney General's censorship campaign against APR content"). On these facts, Plaintiffs' claims are not "entirely derivative" of any right of a defendant in the Enforcement Action; nor are they "unavoidably intertwined and inseparable" from those claims. *Spargo*, 351 F.3d at 84 (internal citation and alterations omitted).

This case instead aligns with those where Courts refused to apply *Younger* to third party claims. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928 (1975) (*Younger* did not bar claims of two plaintiff bar owners not subject to a state prosecution, where the owners were "unrelated in terms of ownership, control, and management" to a third plaintiff bar owner who was subject to prosecution); *Cedar Rapids Cellular Tel., L.P.*, 280 F.3d at 882 (*Younger* did not apply to claims of plaintiff where the plaintiff did not have a "close relationship" with a party to a state proceeding, and there was "no indication that [the plaintiff] could use an injunction

obtained in [the] federal action to interfere with the Attorney General's enforcement action . . . .). *See also Casa Marie, Inc. v. Superior Ct. of Puerto Rico for Dist. of Arecibo*, 988 F.2d 252, 267 (1st Cir. 1993) (noting that "unrelated, legally distinct parties" may "mount separate but simultaneous legal challenges to the constitutionality of a state statute").

The Attorney General's cases are distinguishable. In them, the plaintiffs' claims were entirely derivative—in other words, they rose or fell with those of the state court litigant. That is not the case here. *See, e.g., Hicks v. Miranda*, 422 U.S. 332 (1975) (*Younger* barred claims of two theater owners seeking to enjoin enforcement of a state obscenity statute, where criminal charges had been filed against two employees of the theater (but not the owners) because the interests of the owners and the employees "were intertwined[,] and . . . the federal action sought to interfere with the pending state prosecution"); *Spargo*, 351 F.3d at 85 (*Younger* applied where a judge and his political supporters sought to enjoin, on First Amendment grounds, state disciplinary proceedings against the judge—even though the supporters were not parties to the disciplinary proceeding—because the supporters "may claim no greater First Amendment protection than" the judge, and sought to "directly interfere with the pending disciplinary proceeding").

In short, the Supreme Court has "stressed" that the circumstances "fitting within the *Younger* doctrine" are "exceptional." *Sprint Commc'ns, Inc*, 571 U.S. at 73. Such circumstances are absent here. The "issuance of a preliminary

injunction," therefore, "is not subject to the restrictions of *Younger*." *Doran*, 422 U.S. at 930.

### B.   *Colorado River* Abstention

A federal court may, in "exceptional circumstances," abstain from exercising jurisdiction "when parallel state-court litigation could result in 'comprehensive disposition of litigation' and abstention would conserve judicial resources." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  This doctrine "is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 (1983).  The Court must keep in mind that "abstention is generally disfavored, and federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction." *Niagara Mohawk Power Corp.*, 673 F.3d at 100 (quoting *Colorado River*, 424 U.S. at 817).

Here, because Plaintiffs are not parties to the Enforcement Action, the state litigation will not result in the sort of "comprehensive disposition of litigation" contemplated in *Colorado River*.  This doctrine, therefore, does not apply.  *See Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998) ("None of the plaintiffs in this action are involved in the state case which presents distinctly different facts and predominately state law claims.  Moreover, the district court's concern for piecemeal litigation is misguided as resolution of the federal constitutional claims will determine the case before us, regardless of the outcome of the state case").

## C.   *Pullman* Abstention

*Pullman* abstention "involves an inquiry focused on the possibility that the state courts may interpret a challenged state statute so as to eliminate or at least to alter materially, the constitutional question presented." *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 477 (1977) (citing *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496 (1941)).

The following "criteria must be established in order to justify abstention on *Pullman* grounds: (1) an unclear state statute or uncertain state law issue; (2) determination of the federal issue turns upon resolution of the unclear state law provision; and (3) the state law provision is susceptible to an interpretation that would avoid or modify the federal constitutional question presented." *Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus*, 60 F.3d 122, 126 (2d Cir. 1995).

Here, the State points only to the issues of whether: (1) Plaintiffs' statements are false—a question of fact—and (2) Plaintiffs' speech is commercial—a question of federal Constitutional law. *See* Dkt. 20 at 21. The State, therefore, "failed to identify unclear state law issues whose proper interpretation would resolve, moot, or modify the federal constitutional issue presented." *Planned Parenthood of Dutchess-Ulster, Inc.*, 60 F.3d at 126. *Pullman* does not apply.

## D.   Declaratory Judgment Act

Lastly, the Attorney General urges this Court to "exercise its broad discretion under the Declaratory Judgment Act and decline to hear this case." Dkt. 20 at 21. But she does not explain how the Court's discretion to issue a declaratory judgment

affects whether it should determine Plaintiffs' current request for injunctive relief. The Declaratory Judgment Act presents no obstacle to this Court's exercise of jurisdiction.

In sum, federal courts have a "generally broad duty" to exercise jurisdiction. *Planned Parenthood of Dutchess-Ulster*, 60 F.3d at 126.  And there "is little, if any, discretion to abstain in a case [that] does not meet the requirements of a particular abstention principle." *Id.*  Where, as here, a "case presents none of the circumstances the [Supreme] Court has ranked as 'exceptional,' the general rule governs," namely, that the "pendency of an action in [a] state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Sprint Commcns, Inc.*, 571 U.S. at 73 (quoting *Colorado River*, 424 U.S. at 817).

## IV.   MOTION FOR A PRELIMINARY INJUNCTION

The preliminary injunction factors fully favor Plaintiffs on this record.

However enumerated in various decisions, the four-factor test remains: to "obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Libertarian Party of Connecticut v. Lamont*, 977 F.3d 173, 176 (2d Cir. 2020) (internal citation and alteration omitted).  In addition, (4) the "movant also must show that the balance of equities tips in [its] favor." *Id. See also Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 ("The default rule is that a plaintiff seeking a preliminary injunction must make a clear showing that 'he

is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest'") (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Plaintiffs are likely to succeed on the merits of their First Amendment Free Speech claim.[10] The First Amendment protects Plaintiffs' right to speak freely about APR protocol and, more specifically, to say that it is safe and effective for a pregnant woman to use in consultation with her doctor. Indeed, the "very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 791 (1988) (quoting *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring)). To "this end, the government, even with the purest of motives, may not substitute its judgment as to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if directed by the government." *Id.* And this is particularly true "in the fields of medicine and public health, where information can save lives." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 771 (2018) (quoting *Sorrell*, 564 U.S. at 566).

---

[10] To "warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief." *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (internal citation and alterations omitted). Rather, "they need to show a likelihood of success on the merits of at least one of their claims." *Id.* Because Plaintiffs are likely to succeed on the merits of their Free Speech claim, their Free Exercise claim and Due Process claims need not be addressed now.

Plaintiffs are irreparably harmed each day that their First Amendment freedoms are infringed. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). A preliminary injunction fosters Plaintiffs' "inalienable rights" to "[f]reedom of speech and thought," *see Alvarez*, 567 U.S. at 728, and, moreover, serves the public interest by allowing women to access and receive information that may lead to saving the lives of their unborn children. The balance of equities similarly tips decidedly in Plaintiffs' favor. Each of these conclusions is explained below.

## A.      Likelihood of Success on the Merits

Plaintiffs argue that the Attorney General's enforcement of the New York Statutes, which is aimed at "punish[ing] statements supporting the safety and efficacy" of APR, amounts to content and viewpoint discrimination in violation of the First Amendment. *See* Dkt. 3-1 at 16. They maintain that the Free Speech clause "permits Christian nonprofits like Plaintiffs to speak truthfully" about services "that they do not charge for and that doctors perform." *Id.* at 18.

The State responds that, to "the extent Plaintiffs allege that they made or would like to make the same statements, in the same consumer-oriented context as those at issue in the Enforcement Action," such statements would be "false and/or misleading commercial speech and beyond the scope of First Amendment protection." Dkt. 20 at 38.

Plaintiffs are likely to succeed on the merits of their Free Speech claim. The Attorney General's enforcement of the New York Statutes against Plaintiffs, based

on statements about APR, is a content and viewpoint-based regulation of non-commercial speech that cannot survive strict scrutiny.  In the absence of fraudulent intent—or anything else to suggest that this is one of the "few categories of expression where content-based regulation is permissible," *Alvarez*, 567 U.S. at 715—such enforcement is prohibited by the First Amendment.

          1.    <u>Legal Framework</u>

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.[11]  This provision "embodies '[o]ur profound national commitment to the free exchange of ideas.'"  *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002) (quoting *Harte–Hanks Commc'n, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989)).

As a "general matter, 'the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 65 (1983) (quoting *Police Dep't v. Mosley*, 408 U.S. 92, 95 (1972)).  *See also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys") (citation omitted).  When the government targets "particular *views* taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Id.* at 829 (emphasis added).  Viewpoint discrimination "is thus

---

[11] The "Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States."  *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).

an egregious form of content discrimination." *Id.* And the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*

Content-based speech restrictions "are subject to 'strict scrutiny'—that is, the government must show that the regulation at issue is narrowly tailored to serve or promote a compelling government interest." *United States v. Caronia*, 703 F.3d 149, 163 (2d Cir. 2012). Such restrictions are "presumptively invalid." *Id.* (citation omitted). Meanwhile, "non-content-based regulation and regulation of commercial speech—expression solely related to the economic interests of the speaker and its audience—are subject to intermediate scrutiny." *Id. See also Bolger*, 463 U.S. at 65 ("regulation of commercial speech based on content is less problematic").

The "propriety of distinguishing commercial from noncommercial speech in evaluating a First Amendment claim derives from Supreme Court precedents affording the former only 'a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values.'" *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)). The Supreme Court has explained that:

> [t]wo features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity. In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not particularly susceptible to being crushed by overbroad regulation.

*Id.* (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564n.6 (1980)).

In sum, because "the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or non-commercial speech," the Court "must first determine the proper classification" of the speech at issue. *Bolger*, 463 U.S. at 65. Accordingly, the Court next considers whether Plaintiffs' statements about APR are commercial speech. For the reasons below, they are not.

### 2.    Commercial vs. Noncommercial Speech

The parties dispute whether the speech is commercial. Plaintiffs argue that it is non-commercial because "[p]regnancy centers' speech about progesterone for APR—a service that physicians provide—proposes no transaction and comes free of charge." Dkt. 3-1 at 22-23. The State responds that "neither the absence of a direct financial transaction for the services advertised nor the religious viewpoint of the speaker provides a blanket exemption from speech begin considered commercial." Dkt. 20 at 36. On this record, the speech is noncommercial.

The "core notion" of commercial speech is "speech which does 'no more than propose a commercial transaction.'" *Bolger*, 463 U.S. at 66 (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976)). The "Supreme Court has also defined commercial speech as 'expression related solely to the economic interests of the speaker and its audience.'" *Connecticut Bar Ass'n*, 620 F.3d at 94 (quoting *Central Hudson Gas & Elec. Corp.*,

447 U.S. at 561).  And it "has focused on three factors in evaluating whether speech is commercial: whether the speech is an advertisement, whether it references a particular product, and whether there is an economic motivation underlying the speech." *Nat'l Inst. of Fam. & Life Advocs., Aspire Together, Inc. v. Clark*, No. 2:23-CV-229, 2024 WL 3027983, at *8 (D. Vt. June 14, 2024) (citing *Bolger*, 463 U.S. at 66-67).  While "none of these factors [is] dispositive, the presence of all three 'provides strong support' for the characterization of speech as commercial." *Id.* at *15n.8 (quoting *Bolger*, 463 U.S. at 67 n.14).

Here, Plaintiffs' speech about APR does not merely "propose a commercial transaction" or relate "solely to the economic interests of the speaker and its audience." *See Bolger*, 463 U.S. at 66; *Connecticut Bar Ass'n*, 620 F.3d at 94 (quoting *Central Hudson Gas & Elec. Corp.*, 447 U.S. at 561).  To some extent, the speech generally refers to a service or a medical hormone treatment.  But even if Plaintiffs' statements could be construed as "advertising" APR, there is no evidence of any underlying economic motivation.  According to Plaintiffs, "NIFLA's New York Members do not perform progesterone treatment" themselves.  Dkt. 1 ¶ 34.  Rather, they "refer clients interested in this service to physicians who prescribe it." *Id.*  All "referrals for progesterone treatment by NIFLA's New York members are offered free of charge." *Id.* ¶ 35.  And "[n]either NIFLA nor its members receive any renumeration for these referrals." *Id.*  Further, the "women referred by NIFLA and its members to partnering physicians for progesterone treatment do not pay for the progesterone treatment." *Id.* ¶ 36.  Indeed, "most pro-life pregnancy centers—

including Plaintiffs—charge nothing for their services, meaning that they do not financially benefit from any choice a woman makes." *Id.* ¶ 80.

In short, a "morally and religiously motivated offering of free services cannot be described as a bare 'commercial transaction.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108 (4th Cir. 2018). As such, the speech at issue here is not commercial. *See Clark*, 2024 WL 3027983, at *8 ("it is difficult to categorize solicitations as "proposed transactions" when the target audience is not charged"); *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 705 (N.D. Ill. 2023) ("To some extent the speech refers to a service, but the service is general. But, most importantly, there is no economic motivation for the speech. Centers are not compensated by the individuals they speak to, provide pregnancy tests for, or give baby supplies to. The same is true for sidewalk counselors. There is no renumeration of any kind and there is no economic motivation of any kind. In short, there is no commercial transaction in these interactions") (citations omitted). Nothing could be fundamentally less commercial than this speech about how a woman might save her pregnancy.

### 3. The Attorney General's Enforcement of the New York Statutes Fails Strict Scrutiny

Because Plaintiffs' speech is noncommercial, restrictions are subject to strict scrutiny. *See Caronia*, 703 F.3d at 163. The State's enforcement of the New York Statutes against pro-life pregnancy centers based on their speech about APR is a content-based restriction, as it "target[s] speech based on its communicative

content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).  It is also

viewpoint-based.  The Attorney General targets statements supporting the APR

protocol.  Indeed, a "speech edict aimed directly at those pregnancy clinics that do

not provide or refer for abortions is neither viewpoint nor content neutral." *Greater*

*Baltimore Ctr. for Pregnancy Concerns, Inc.*, 879 F.3d at 112.  As discussed, strict

scrutiny permits speech restrictions only when the government proves that its

restrictions are "narrowly tailored to serve or promote a compelling government

interest." *Caronia*, 703 F.3d at 163.

At the preliminary injunction hearing, the State conceded that it does not

attempt to satisfy strict scrutiny.[12]  And the record is devoid of anything to suggest

that this standard could be met.  The State asserts that it has an "interest" in

"protecting New York consumers and the public from the harms false and/or

misleading business and advertising practices cause."  *See* Dkt. 20 at 42.  But "to

recite the Government's [arguably] compelling interests is not to end the matter."

*Alvarez*, 567 U.S. at 725.  It is well-established that "falsity alone may not suffice to

bring the speech outside the First Amendment."  *Id.* at 719.[13]  Rather, the

Constitution "requires that the Government's chosen restriction on the speech at

issue be 'actually necessary' to achieve its interest."  *Id.* (quoting *Brown v. Ent.*

---

[12] Rather, the State maintains that the speech at issue amounts to "false
commercial speech" unprotected by the First Amendment.

[13] As noted above, the Supreme Court "has stressed the danger of content-based
regulations 'in the fields of medicine and public health, where information can save
lives.'" *Becerra*, 585 U.S. at 771 (quoting *Sorrell*, 564 U.S. at 566).

*Merchants Ass'n*, 564 U.S. 786, 799 (2011)).  In other words, there "must be a direct causal link between the restriction imposed and the injury to be prevented."  *Id.*

The State—assuming it tried—falls short of establishing the required nexus. Even assuming that progesterone treatment presents a risk of harm to a pregnant woman, the treatment can only be obtained through a prescription from a doctor. Plaintiffs' speech, therefore, would—*at most*—encourage a woman to speak with her doctor about her treatment options.  The State fails to explain why forbidding speech about APR "was a necessary as opposed to merely convenient means of achieving its interests."  *Thompson*, 535 U.S. at 357.  The State, moreover, conceded that no one has been harmed by Plaintiffs' statements.  Indeed, the "State cannot engage in content-based discrimination to advance its own side of a debate." *Sorrell*, 564 U.S. at 580.  And if "the First Amendment means anything, it means that regulating speech must be a last—not first—resort."  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).  Yet "here it seems to have been the first strategy the Government thought to try."  *Id.*[14]

---

[14] Nor is this a case of the State exercising its "firmly established" power "to protect people against fraud."  *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) *(quoting Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 190 (1948)).  Indeed, "the First Amendment does not shield fraud."  *Id.*  But there is nothing to suggest that the essential elements of fraud are present.  Under "New York law, to state a claim for fraud[,] a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996)).  Here, at minimum, there is no suggestion that Plaintiffs knowingly made false statements.  And, as discussed, the State admits that no one has been harmed by the statements.

In sum, it is "forward thinking to begin by reading the First Amendment as ratified in 1791; to understand the history of authoritarian government as the Founders then knew it; to confirm that history since then shows how relentless authoritarian regimes are in their attempts to stifle free speech; and to carry those lessons onward as we seek to preserve and teach the necessity of freedom of speech for the generations to come." *Becerra*, 585 U.S. at 780 (Kennedy, J., concurring). Plaintiffs are likely to succeed on the merits of their Free Speech claim.[15]

## B.    Irreparable Harm

Plaintiffs argue they "are suffering irreparable harm due to the chilling effect of the Attorney General's enforcement of the [New York Statutes] against similar pro-life organizations." Dkt. 3-1 at 32.  They explain that, "since the Attorney General issued her Notices [of Intention to Sue], NIFLA has stopped urging New York centers who are not already offering APR to do so." *Id.*  And "some of NIFLA's

---

[15] The Court would reach the same conclusion even if Plaintiffs' speech about APR qualified as commercial speech.  In *Central Hudson*, the Supreme Court "adopted a four-part analysis for assessing the validity of restrictions on commercial speech." *Bolger*, 463 U.S. at 68–69 (quoting *Central Hudson*, 447 U.S. at 563).  Specifically:

> First, we determine whether the expression is constitutionally protected. For commercial speech to receive such protection, it at least must concern lawful activity and not be misleading. Second, we ask whether the governmental interest is substantial. If so, we must then determine whether the regulation directly advances the government interest asserted, and whether it is not more extensive than necessary to serve that interest.

*Id.* (internal citations an alterations omitted).  For the same reasons discussed in Section IV(A)(3) above—particularly with respect to the direct advancement requirement—the State fails under this standard as well.

New York members, including Gianna's House and Options Care Center, have since removed statements from their websites, despite their firm belief that the statements are accurate and despite their desire to continue making those statements." *Id.* at 32-33.  Plaintiffs have established irreparable harm.

Irreparable harm is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003).  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).  The "denial of a constitutional right ordinarily warrants a finding of irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

Here, absent a preliminary injunction, Plaintiffs' constitutional rights are being violated.  Plaintiffs wish to speak freely about a protocol that a pregnant woman may use, with her doctor, to reverse the effects of a first chemical abortion pill and, thereby, help to save the life of her unborn child.  Indeed, "[f]reedom of speech and thought flows not from the beneficence of the state[,] but from the inalienable rights of the person." *Alvarez*, 567 U.S. at 728.  And "society has the right and civic duty to engage in open, dynamic, rational discourse." *Id.*  These "ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id.*

The loss of "First Amendment freedoms, for *even minimal periods of time*, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn,* 141 S.Ct. at 67 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (emphasis added). *See also A.H. by & through Hester*, 985 F.3d at 184 ("The denial of a constitutional right ordinarily warrants a finding of irreparable harm, *even when the violation persists for 'minimal periods' of time*.") (emphasis added). Here, too, Plaintiffs suffer irreparable injury each time they are forced to give up their First Amendment freedoms.

In sum, there "can be no question that the challenged restrictions . . . cause irreparable harm." *See Roman Cath. Diocese of Brooklyn,* 141 S.Ct. at 67. Plaintiffs satisfy the irreparable harm element.

### C.    Public Interest and Balance of Equities

The Court must consider whether a preliminary injunction is in the public interest and whether the balance of equities tips in Plaintiffs' favor. *See Lamont*, 977 F.3d at 176.

The Attorney General argues that the State "has a significant interest in enforcing the [New York Statutes] to protect New York consumers against false and misleading commercial speech." Dkt. 20 at 48. She also presumably has a generalized enforcement interest. But she admits that no one has been harmed by Plaintiffs' speech. A preliminary injunction, however, would "further the societal interest in the fullest possible dissemination of information." *Cent. Hudson Gas & Elec. Corp.* 447 U.S. at 561–62. And a preliminary injunction fosters the First

Amendment rights discussed above.  Moreover, pregnancy centers' statements
about the availability of APR are of interest to women who have begun a chemical
abortion and seek ways to save their unborn child's life.  A preliminary injunction is
in the public interest.

Similarly, the balance of equities also tips in favor of Plaintiffs.  Absent an
injunction, Plaintiffs are harmed each day they are forced to give up their
Constitutional right to speak freely.  The Attorney General's equitable
counterweights, if any, are insufficient to deny relief on this record.

## V.    SECURITY

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether
it should require plaintiffs to post security and, if so, in what amount.  *See Dr.'s
Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the
district court wide discretion to set the amount of a bond, and even to dispense with
the bond requirement [in certain situations].").

On these facts, the Court will not require Plaintiffs to post security because a
bond requirement does not fit the fact-pattern and interests involved in this case.
*See Dr.'s Assocs.*, 107 F.3d at 135-36 (affirming district court's decision not to
require security where the district court "found that [defendants] would not suffer
damage or loss from being forced to arbitrate in lieu of prosecuting their state-court
cases").  *See also Clarkson Co. v. Shaheen,* 544 F.2d 624, 632 (2d Cir. 1976) (Because
no request for a bond was ever made in the district court, and because, under Fed.

R. Civ. P. 65, "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court").

## CONCLUSION

For the above reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction as follows: it is

ORDERED that Defendant Letisha James, in her official capacity, as well as her officers, agents, employees, attorneys, and all persons in active concert or participation with her who receive actual notice of the Order, are ENJOINED, effective immediately, from enforcing, or seeking to enforce, New York General Business Law Article 22-A, §§ 349 and 350 and New York Executive Law § 63(12), against Plaintiffs National Institute of Family and Life Advocates, Gianna's House, Inc., and Choose Life of Jamestown, Inc. d/b/a Options Care Center, for making the following statements (or substantially similar statements), directed toward the public—or women considering or in the midst of a chemical abortion—in Plaintiffs' advertising, public websites, social media platforms, promotional materials, and resources provided to pregnancy centers (or in substantially similar contexts):

- Statements using the term "Abortion Pill Reversal" or "APR" related to chemical abortions;

- Statements referring to the APR Hotline or AbortionPillReversal.com;

- Statements indicating that Abortion Pill Reversal (or APR), or progesterone, is safe; and

- Statements that Abortion Pill Reversal (or APR), or progesterone, is effective.

It is further

ORDERED that this preliminary injunction shall remain in effect pending disposition of the case on the merits; and it is further

ORDERED that no bond shall be required.


SO ORDERED.

Dated:     August 22, 2024
           Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE